# Exhibit 4

Original Investigation

# Association of Industry Payments to Physicians With the Prescribing of Brand-name Statins in Massachusetts

James S. Yeh, MD, MPH; Jessica M. Franklin, PhD; Jerry Avorn, MD; Joan Landon, MPH; Aaron S. Kesselheim, MD, JD, MPH

← Editorial and Editor's Note

← Related articles

**IMPORTANCE**  Pharmaceutical industry payments to physicians may affect prescribing practices and increase costs if more expensive medications are prescribed.

**OBJECTIVE**  Determine the association between industry payments to physicians and the prescribing of brand-name as compared with generic statins for lowering cholesterol.

**DESIGN, SETTING, AND PARTICIPANTS**  Cross-sectional linkage of the Part D Medicare prescriptions claims data with the Massachusetts physicians payment database including all licensed Massachusetts physicians who wrote prescriptions for statins paid for under the Medicare drug benefit in 2011.

**MAIN OUTCOMES AND MEASURES**  The exposure variable was a physician's industry payments as listed in the Massachusetts database. The outcome was the physician's rate of prescribing brand-name statins. We used linear regression to analyze the association between the intensity of physicians' industry relationships (as measured by total payments) and their prescribing practices, as well as the effects of specific types of payments.

**RESULTS**  Among the 2444 Massachusetts physicians in the Medicare prescribing database in 2011, 899 (36.8%) received industry payments. The most frequent payment was for company-sponsored meals (n = 639 [71.1%]). Statins accounted for 1 559 003 prescription claims; 356 807 (22.8%) were for brand-name drugs. For physicians with no industry payments listed, the median brand-name statin prescribing rate was 17.8% (95% CI, 17.2%-18.4%). For every $1000 in total payments received, the brand-name statin prescribing rate increased by 0.1% (95% CI, 0.06%-0.13%; $P$ < .001). Payments for educational training were associated with a 4.8% increase in the rate of brand-name prescribing ($P$ = .004); other forms of payments were not.

**CONCLUSIONS AND RELEVANCE**  Industry payments to physicians are associated with higher rates of prescribing brand-name statins. As the United States seeks to reign in the costs of prescription drugs and make them less expensive for patients, our findings are concerning.

*JAMA Intern Med*. doi:10.1001/jamainternmed.2016.1709
Published online May 9, 2016.

**Author Affiliations:** Program On Regulation, Therapeutics, and Law (PORTAL), Division of Pharmacoepidemiology and Pharmacoeconomics, Department of Medicine, Brigham and Women's Hospital and Harvard Medical School, Boston, Massachusetts.

**Corresponding Author:** James S. Yeh, MD, MPH, Program on Regulation, Therapeutics, and Law (PORTAL), Division of Pharmacoepidemiology and Pharmacoeconomics, Department of Medicine, Brigham and Women's Hospital and Harvard Medical School, 1620 Tremont St, Suite 3030, Boston, MA 02120 (jsyeh@partners.org).

In the United States, many physicians have financial relationships with pharmaceutical manufacturers.[1-3] These relationships include the receipt of industry-sponsored meals, subsidies for continuing medical education, fees for consulting and participation on speaking bureaus, grants, and payments for education and training. Payments by pharmaceutical manufacturers to physicians outside the research context may be problematic, because they can be perceived as conflicts of interest that could interfere with physicians' responsibilities to their patients.

Concerns about the financial relationships between physicians and the pharmaceutical industry have led to calls for transparency, as well as increased regulation.[4] Some states, such as Massachusetts, Vermont, Minnesota, and West Virginia, have implemented programs that require physicians to disclose their financial relationships with pharmaceutical manufacturers.[5-7] Most recently, the Affordable Care Act established the federal Open Payments database, which in late 2013 started collecting pharmaceutical manufacturer payments to physicians and publicly posting them.[8]

The regulation of physicians' financial relationships with industry and the importance of transparency about these relationships are controversial.[9-14] A key concern

Copyright 2016 American Medical Association. All rights reserved.

Downloaded From: http://archinte.jamanetwork.com/ by a Harvard University User  on 05/09/2016

Case 1:16-cr-10343-ADB   Document 1064-4   Filed 12/18/19   Page 3 of 11

Research   Original Investigation                                                                                      Industry Payments to Physicians and the Prescribing of Brand-name Statins in Massachusetts

about industry payments to physicians is the potential for increased prescribing of brand-name drugs instead of lower-cost generic drugs that are equally safe and effective or non-drug-based therapies. Some evidence suggests that the financial relationships between industry and physicians may lead to substandard prescribing practices,[15-19] but some physicians and policymakers remain unconvinced.[20,21] One reason is that previous studies[15,16,18,19] have used small samples or self-reports in surveys. Data are now available from large physician payment databases; studies using such databases may provide further insight.[22] For example, Massachusetts requires pharmaceutical companies to collect and report to the state payments of more than $50 to physicians.[23] Using Massachusetts' data on physician payments and federal data on prescriptions for Medicare beneficiaries, we evaluated the association between industry payments to physicians and the prescribing of brand-name statins.

## Methods

### Data Sources

This cross-sectional study was approved by the Brigham and Women's Hospital internal review board committee. It involved 2 large databases containing data for January 1 to December 31, 2011. The first was Medicare Part D prescription claims data prepared by the Centers for Medicare and Medicaid Services (CMS). These data were made publicly available after a Freedom of Information Act request by the news organization ProPublica.[24] This database includes all physicians who had at least 50 prescription drug claims (including refills) covered by Medicare Part D. To protect patient privacy, we did not include physicians who prescribed drugs to 10 or fewer Medicare beneficiaries during 2011. The claims database included the prescribing physician's name, National Prescriber Identification (NPI) number, and practice address. ProPublica assigned each medication, including brand-name and generic identity, a drug identification number. Claims counts including refills were available for each of the drugs, with generic and brand-name versions reported separately. A specific prescription associated with a particular physician was included in the database only if there were 50 or more claims for that drug associated with that physician. For example, if a physician prescribed drug X 60 times (including refills) but drug Y 40 times, only the drug X prescription claims would be associated with that physician's information. Thus, any statins for which there were fewer than 50 claims were not counted in the physician's brand-name percentage calculation. The Medicare Part D data set reflected only prescriptions that were filled. Data was analysed in March of 2015.

The second data source was the Massachusetts physician open payment database, compiled by the Massachusetts Department of Health.[23] Derived from pharmaceutical manufacturer reports, this database included payment information of $50 or more in value to physicians during the study period. The database aggregates the payment types to each physician into 8 categories (defined in the state law): food, grants or educational gifts, bona fide services, educational training (payments received by covered recipients in conjunction with education and training), continuing medical education, charitable donations, marketing studies, and other. The database included identifiable physician information including name, NPI number, and practice address. Using these common identifiers, we linked the 2 databases.

### Key Points

**Question** What is the association between pharmaceutical industry payments to physicians and their prescribing of brand-name statins to lower cholesterol instead of less expensive but equally effective generics?

**Findings** This cross-sectional study used 2011 data from a Massachusetts database of industry payments to physicians and a Medicare prescribing database, and found that physicians with no industry payments had a median prescribing rate for brand-name statins of 17.8%. For every $1000 in industry payments received, this prescribing rate increased by 0.1%.

**Meaning** Industry payments to physicians were associated with higher rates of prescribing brand-name statins.

### Statin Prescription Drug Claims

We focused on statins for 2 reasons. First, these drugs are prescribed frequently. Second, although some statins are available as generics, others are brand-name only and extensively promoted by their manufacturers. We included these statins or statin-containing products: niacin, extended-release and lovastatin (Advicor); lovastatin, extended-release (Altoprev); amlodipine-atorvastatin (Caduet); rosuvastatin (Crestor); sitagliptin-simvastatin (Juvisync); fluvastatin (Lescol); fluvastatin, extended-release (Lescol XL); atorvastatin (Lipitor); ezetimibe-atorvastatin (Liptruzet); pitavastatin (Livalo); lovastatin (Mevacor); pravastatin (Pravachol); niacin, extended-release and simvastatin (Simcor); ezetimibe-simvastatin (Vytorin); and simvastatin (Zocor). During the study period, rosuvastatin and atorvastatin were available as brand-name only except for the last month of 2011, when a generic version of atorvastatin became available.

### Statistical Analysis

The exposure variable was a physician's financial payments from pharmaceutical companies as listed in the Massachusetts payment database. The outcome was the physician's rates of prescribing brand-name statins. The brand-name prescribing rate was calculated as the percentage of all brand-name statins claim counts divided by the total claims counts for all brand-name and generic statins. A claim is the physician's prescription filled by the pharmacy, which is then submitted to and paid by the insurer. We used linear regression models to analyze the association between the intensity of physician-industry relationships (as determined by the amount of industry payments) and prescribing of brand-name statins. We performed sensitivity analyses to check for non-linearity of this relationship by including a squared term of

Copyright 2016 American Medical Association. All rights reserved.

Downloaded From: http://archinte.jamanetwork.com/ by a Harvard University User  on 05/09/2016

Case 1:16-cr-10343-ADB   Document 1064-4   Filed 12/18/19   Page 4 of 11

Industry Payments to Physicians and the Prescribing of Brand-name Statins in Massachusetts    Original Investigation   Research

Table 1. Characteristics of Industry Payments to Physicians in Massachusetts With Statin Prescriptions in the Medicare Database, 2011

| Categories of Payment Defined by Massachusetts Law[23] | Type of Industry Payment, No. (% Total)[a] |
|---|---|
| Food | 639 (71.1) |
| Grants/education gifts | 458 (50.9) |
| Bona fide services[b] | 236 (26.3) |
| Educational training[c] | 95 (10.6) |
| Other[d] | 32 (3.6) |
| CME | 3 (0.3) |
| Marketing studies[e] | NA |
| Charitable donations | NA |

Abbreviation: CME, continuing medical education; NA, not applicable.

[a] Total n = 899, from a total of 2444 physicians with associated statin prescriptions covered by Medicare in our study sample.

[b] An arrangement for services including, but not limited to, research, participation on advisory boards, collaboration with 501(c)(3) organizations dedicated to the promotion of health and the prevention of disease, and presentations at pharmaceutical or medical device manufacturing company-sponsored medical education and training.

[c] Payments received by covered recipients in conjunction with education and training.

[d] Includes other nonexempt payments greater than $50 in value not classified in the other categories of payment.

[e] Payments in conjunction with research other than genuine research.

Table 2. Claims for Brand-name and Generic Statins in 2011[a]

| Type of Drug | Claims, No. |
|---|---|
| Brand-name drug | |
| Lipitor | 268 630 |
| Crestor | 84 380 |
| Lescol | 1368 |
| Vytorin | 881 |
| Lescol XL | 743 |
| Caduet | 85 |
| Total brand-name | 356 087 |
| Generic drug | |
| Simvastatin | 1 028 325 |
| Pravastatin | 115 910 |
| Lovastatin | 59 339 |
| Atorvastatin | 242 |
| Total generic | 1 203 816 |

[a] Claims include original fills and refills. Total brand-name and generic claims = 1 559 903.

payments received in the model and by reestimating the linear model using various cutoffs of total payments received. Adding a squared term for payments to the model allows for the possibility of a curvilinear relationship between payment and prescribing. A large coefficient on the squared term may be evidence of nonlinearity.

We sought to determine whether specific types of industry payments to physicians were associated with their preferences for prescribing either brand-name or generic statins. We used a linear regression model that included binary indicators of receiving each payment type to determine the relationship between the types of physician-industry relationships and the extent of physicians' brand-name prescribing. We examined the most prevalent types of industry relationships in the Massachusetts database: food, bona fide services, grants, and educational training.

## Results

From 363 653 physicians in the Medicare Part D prescription claims database, we identified 9628 with a business address in Massachusetts, of whom 2444 had associated statin prescriptions covered by Medicare. More than one-third of these physicians (n=899 [36.8%]) had financial relationships with pharmaceutical manufacturers disclosed in 2011 (Table 1). The most frequent payment was for company-sponsored meals (71.1%), followed by grants (50.9%), bona fide services, (26.3%), and educational training (10.6%). The median total financial payment was $260 (interquartile range [IQR], $100-$1188). Median value of payments attributed to meals was $187 (IQR, $87-$403); to grants $100 (IQR, $67-$160); to consulting and speaking bureaus $3001 (IQR, $579-$11 750); and to educational training, $345 (IQR, $99-$1015).

### Distribution of Claims for Brand-name and Generic Statins

Brand-name and generic statins accounted for 1 559 003 prescription claims, with 22.8% (n = 356 087) for brand-name drugs (Table 2). Atorvastatin (n = 268 630) accounted for 75.4% of the dispensed brand-name-only drugs. Simvastatin (n = 1 028 325) was the most frequently prescribed generic statin, accounting for 85.4% of the dispensed drugs available as generics.

### Financial Relationships and Brand-name Statin Prescribing

Physicians in the CMS database with eligible statin claims but who were not listed in the Massachusetts open payment database as receiving industry payments had a mean brand-name statin prescribing rate of 17.8% (95% CI, 17.2%-18.4%), which was about the same as the comparable rate for all physicians listed in the Massachusetts database 17.8% (95% CI, 17.3%-18.3%). Among physicians with industry payments reported in the Massachusetts database, every $1000 in total payments received was associated with a 0.1% increase in the rate of brand-name statin drug prescribing (95% CI, 0.06%-0.13%; $P$ < .001) (Figure 1A). The overall relationship was linear, as demonstrated by the sensitivity analysis that included a squared term for total payments (Figure 1B). The small proportion of physicians with higher payments primarily drove the linear relationship. When the analysis was restricted to physicians with total payments of $2000 or less, a linear relationship was no longer found (Figure 2).

### Types of Payments and Brand-name Prescribing

Among physicians who received industry payments, payments for educational training were associated with an average 4.8% increase in brand-name prescribing compared with no receipt of educational training (95% CI, 1.55-7.95; $P$ = .004),

Copyright 2016 American Medical Association. All rights reserved.

Downloaded From: http://archinte.jamanetwork.com/ by a Harvard University User on 05/09/2016

Case 1:16-cr-10343-ADB   Document 1064-4   Filed 12/18/19   Page 5 of 11

Research   Original Investigation                                                                  Industry Payments to Physicians and the Prescribing of Brand-name Statins in Massachusetts

Figure 1. Effect of Industry Payments on Brand-name Statin Prescribing



Each circle represents one physician. The solid black line is the estimated linear association between payment and brand name statin prescribing percentage and the dashed lines represent the 95% confidence bounds around the estimated associations. A, Association of industry payments to physicians and percentage of brand-name statin prescribing. B, Sensitivity analysis of relationship between industry payments to physicians and percentage of brand-name statin prescribing using squared terms. The solid orange line is the estimated association when including both linear and squared terms in the model.

Figure 2. Association of Financial Payments and Brand-name Statin Prescribing Among Physicians Receiving $2000 or Less in Total Payment



Each circle represents one physician. The solid black line is the estimated linear association between payment and brand name statin prescribing percentage and the dashed lines represent the 95% confidence bounds around the estimated associations.

but the other payment types such as food, consulting and speaking bureau, and grants were not (Table 3).

## Discussion

We found an association between industry payments to physicians and the prescribing of brand-name statins, a frequently prescribed class of medications with many low-cost generic options with similar effectiveness. For most patients diagnosed as having hypercholesterolemia, statins are interchangeable. Given the large cost differences between generic and brand-name statins (2- to 4-fold higher average wholesale price for brand-name statins) the financial effects on patients and the health care system are likely to be substantial. A recent study showed that initiation of generic statins was associated with improved cardiovascular outcomes among patients owing to better patient adherence.[25]

Copyright 2016 American Medical Association. All rights reserved.

Downloaded From: http://archinte.jamanetwork.com/ by a Harvard University User  on 05/09/2016

Case 1:16-cr-10343-ADB   Document 1064-4   Filed 12/18/19   Page 6 of 11

Industry Payments to Physicians and the Prescribing of Brand-name Statins in Massachusetts                                                           Original Investigation Research

Table 3. Financial Payment Types and Their Association With Brand-name Prescribing Rates for Statins

| Variable | Increase in Brand-name Prescribing, % (95% CI) | P Value |
|---|---|---|
| Food | −1.1 (−2.56 to 0.42) | .16 |
| Bona fide services | −0.6 (−2.79 to 1.60) | .59 |
| Grants/educational gifts | 0.6 (−0.99 to 2.28) | .44 |
| Educational training | 4.8 (1.55 to 7.97) | .004 |

We also found a threshold effect in the association between industry payments to physicians and brand-name prescribing; when the analysis was limited to physicians who received $2000 or less in total payments in 2011 the association was no longer significant. This result is consistent with the presumption that larger industry payments to physicians are more likely to influence physicians' prescribing behavior. In addition, our findings were likely diluted because we included all industry payments, not just those from manufacturers of statins or directed to statin-relevant activities. Thus, it is possible that the effect on prescribing that we found is stronger among physicians with close ties to particular companies.

Open payment databases, such as the one in Massachusetts, promote transparency with respect to industry payments that can potentially bias physician behavior. Our analysis suggests that certain payment types may be more of a cause for concern than others. Of the various forms of payments received by physicians, those for educational training support were associated with higher rates of brand-name prescribing. Some have argued that such payments are essentially marketing payments and should be disclosed or banned. Since the public release of the Open Payments database in 2014, pharmaceutical companies no longer have to report to Massachusetts the payments that were disclosed to the federal government, unless required reporting by Massachusetts was not covered by Open Payments. Despite the promise of state and federal payment databases and their intent to promote transparency, it is not yet known how widely such databases are being used by patients or whether physician prescribing behaviors have changed.

Our cross-sectional study has notable limitations. We could detect an association only between brand-name prescribing and financial relationships. It is possible that the physicians who more frequently prescribed brand-name pharmaceuticals were also those who were more open to receiving industry funding for meals, conferences, or other purposes. Alternatively, high prescribers of brand-name drugs may have been sought after by pharmaceutical companies to promote their products through various marketing activities, such as participation in speakers' bureaus. Manufacturers purchase prescribing data for individual physicians from IMS Health and other vendors and use such information to guide their marketing efforts. Because the Medicare Part D prescription database includes only insurance claims for prescriptions that were filled, our analysis may have underestimated the extent of brand-name prescribing. Research suggests that prescriptions for brand-name prescriptions are less likely to be filled than prescriptions for generics, owing to their higher cost.[26,27]

Our findings are also limited by the accuracy of reporting of industry payments in the Massachusetts; there is no process to ensure the completeness and accuracy of reports. For example, companies may choose to report certain payments to physicians as bona fide services, a catch-all payment category that might cover payments for marketing-related consulting, participating in speakers bureaus, and research. In addition, payments for education might be reported under several payment categories, such as grants/educational gifts, and educational training. We were unable to determine the frequency of misattribution of the payment category or underreporting of payments. Nor were we able to control for certain physician characteristics not found in either database (eg, practice characteristics, level of experience) that may have an impact on prescribing patterns. We could not determine which physicians received payments from a specific company and analyze their prescribing of that company's products.

## Conclusions

As the United States seeks to rein in the costs of prescription drugs and make them less expensive for patients, our findings are a cause for concern. We found that pharmaceutical industry payments to physicians were associated with higher rates of prescribing brand-name statins. On average, a $1000 increase in total payments was associated with a 0.1% increase in the percentage of brand-name prescriptions.

**ARTICLE INFORMATION**

**Accepted for Publication:** March 7, 2016.

**Published Online:** May 9, 2016.
doi:10.1001/jamainternmed.2016.1709.

**Author Contributions:** Dr Yeh had full access to all of the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis.
*Study concept and design:* Yeh, Kesselheim.
*Acquisition, analysis, or interpretation of data:* All authors.
*Drafting of the manuscript:* Yeh.
*Critical revision of the manuscript for important intellectual content:* All authors.
*Statistical analysis:* Yeh, Franklin, Avorn, Landon.
*Obtained funding:* Avorn, Kesselheim.
*Administrative, technical, or material support:* Yeh, Avorn.
*Study supervision:* Franklin, Avorn, Kesselheim.

**Conflict of Interest Disclosures:** None reported.

**REFERENCES**

1. Campbell EG. Doctors and drug companies—scrutinizing influential relationships. *N Engl J Med*. 2007;357(18):1796-1797.

2. Austad KE, Avorn J, Franklin JM, Kowal MK, Campbell EG, Kesselheim AS. Changing interactions between physician trainees and the pharmaceutical industry: a national survey. *J Gen Intern Med*. 2013; 28(8):1064-1071.

3. Campbell EG, Rao SR, DesRoches CM, et al. Physician professionalism and changes in physician-industry relationships from 2004 to 2009. *Arch Intern Med*. 2010;170(20):1820-1826.

4. Agrawal S, Brennan N, Budetti P. The Sunshine Act—effects on physicians. *N Engl J Med*. 2013;368 (22):2054-2057.

5. Chimonas S, Rozario NM, Rothman DJ. Show us the money: lessons in transparency from state pharmaceutical marketing disclosure laws. *Health Serv Res*. 2010;45(1):98-114.

6. Ross JS, Lackner JE, Lurie P, Gross CP, Wolfe S, Krumholz HM. Pharmaceutical company payments to physicians: early experiences with disclosure

**Copyright 2016 American Medical Association. All rights reserved.**

Downloaded From: http://archinte.jamanetwork.com/ by a Harvard University User on 05/09/2016

Case 1:16-cr-10343-ADB   Document 1064-4   Filed 12/18/19   Page 7 of 11

Research  Original Investigation                                    Industry Payments to Physicians and the Prescribing of Brand-name Statins in Massachusetts

laws in Vermont and Minnesota. *JAMA*. 2007;297 (11):1216-1223.

7. Grande D. Limiting the influence of pharmaceutical industry gifts on physicians: self-regulation or government intervention? *J Gen Intern Med*. 2010;25(1):79-83.

8. Kirschner NM, Sulmasy LS, Kesselheim AS. Health policy basics: the Physician Payment Sunshine Act and the Open Payments program. *Ann Intern Med*. 2014;161(7):519-521.

9. Pharma Pushes CMS for Transparency on Sunshine Database. Again. 2014; http://blogs.wsj.com/pharmalot/2014/09/24/pharma-pushes-cms-for-transparency-on-sunshine-database-again/. Accessed December 9, 2015.

10. Ratain MJ. Forecasting unanticipated consequences of "The Sunshine Act": mostly cloudy. *J Clin Oncol*. 2014;32(22):2293-2295.

11. Amid the Sunshine, Controversy Lingers: The Release of CMS's "Open Payments" System. 2014; http://www.forbes.com/sites/insider/2014/10/01/amid-the-sunshine-controversy-lingers-the-release-of-cmss-open-payments-system/. Accessed December 29, 2015.

12. Wilson M. Is transparency really a panacea? *J R Soc Med*. 2014;107(6):216-217.

13. Pham-Kanter G. Act II of the Sunshine Act. *PLoS Med*. 2014;11(11):e1001754.

14. Carlat D. Exploring the link between industry payments to doctors and prescribing habits. *BMJ*. 2014;349:g6651.

15. Bowman MA, Pearle DL. Changes in drug prescribing patterns related to commercial company funding of continuing medical education. *J Contin Educ Health Prof*. 1988;8(1):13-20.

16. Orlowski JP, Wateska L. The effects of pharmaceutical firm enticements on physician prescribing patterns. There's no such thing as a free lunch. *Chest*. 1992;102(1):270-273.

17. Lieb K, Scheurich A. Contact between doctors and the pharmaceutical industry, their perceptions, and the effects on prescribing habits. *PLoS One*. 2014;9(10):e110130.

18. Wazana A. Physicians and the pharmaceutical industry: is a gift ever just a gift? *JAMA*. 2000;283 (3):373-380.

19. King M, Essick C, Bearman P, Ross JS. Medical school gift restriction policies and physician prescribing of newly marketed psychotropic medications: difference-in-differences analysis. *BMJ*. 2013;346:f264.

20. Harrington RA, Califf RM. There is a role for industry-sponsored education in cardiology. *Circulation*. 2010;121(20):2221-2227.

21. Rosenbaum L. Beyond moral outrage—weighing the trade-offs of COI regulation. *N Engl J Med*. 2015;372(21):2064-2068.

22. Engelberg J, Parsons CA, Tefft N. Financial Conflicts of Interest in Medicine. http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2297094. Accessed December 29, 2015 2014.

23. Pharmaceutical Code of Conduct. http://www.mass.gov/eohhs/gov/departments/dph/programs/hcq/healthcare-quality/pharm-code-of-conduct/. Accessed December 29, 2015.

24. Propublica. Propublica Prescriber Checkup Methodology. https://www.propublica.org/article/how-we-analyzed-medicares-drug-data-long-methodology. Accessed February 17, 2016.

25. Gagne JJ, Choudhry NK, Kesselheim AS, et al. Comparative effectiveness of generic and brand-name statins on patient outcomes: a cohort study. *Ann Intern Med*. 2014;161(6):400-407.

26. Shrank WH, Hoang T, Ettner SL, et al. The implications of choice: prescribing generic or preferred pharmaceuticals improves medication adherence for chronic conditions. *Arch Intern Med*. 2006;166(3):332-337.

27. Green JB, Ross JS, Jackevicius CA, Shah ND, Krumholz HM. When choosing statin therapy: the case for generics. *JAMA Intern Med*. 2013;173(3):229-232.

Copyright 2016 American Medical Association. All rights reserved.

Downloaded From: http://archinte.jamanetwork.com/ by a Harvard University User on 05/09/2016

EDITORIAL

# Promise and Peril for Generic Drugs

Joshua M. Sharfstein, MD; Jeremy Greene, MD, PhD

**Generic drugs** now make up more than 88% of all prescriptions filled in pharmacies in the United States and have provided nearly $1.7 trillion in health care savings in the past decade.[1] Yet tensions still persist between brand-name drugs and generics. Fifty years ago, pharmaceutical companies hurled the word *generic* as an insult—a reference to often unauthorized copies made by small manufacturers with questionable assurances of product utility. Yet the growth of this new industry was already under way, spurred on by waves of patent expirations, Congressional inquiries, and increasing interests of purchasers in less expensive versions of essential medications.[2(pp1-136)]


Editor's Note


Related articles

A critical inflection point in the growth curve of the generic drug industry came with the development of bioequivalence standards by the US Food and Drug Administration (FDA). These standards required not only that the generic formulation contain the active ingredient but also that this ingredient be as available to the human body as the reference drug. In 1984, the Hatch-Waxman Act included bioequivalence as part of a unified pathway for generic drug approval and set the foundation for the modern generic industry.

Since the passage of the Hatch-Waxman Act, generic medications have assumed a central role in the delivery of high-quality, low-cost health care. Laws that once prohibited generic substitution have been reversed and now permit or mandate substitution at the pharmacy for generic alternatives to brands. Millions of consumers rely on generics to be able to afford essential medical treatments. And a robust series of studies have countered lingering myths about the safety and effectiveness of generic drugs.[3,4]

Yet the path from a new law to a new industry has hardly been smooth. In the late 1980s, a generic drug scandal at the FDA involving bribery and favoritism led to years of Congressional inquiry into FDA oversight, prison terms for FDA officials, and the resignation of the FDA Commissioner. While domestic regulation of the generic industry has stabilized, the global expansion of the pharmaceutical industry has led to increased concerns about the quality of drugs manufactured overseas.[5] In recent years, the major generic manufacturer Ranbaxy has been found to have substandard quality control mechanisms for a broad range of products,[6] and the FDA's leadership has recently written about "challenges associated with the quality of generic drugs coming out of some facilities in India."[7] Nonetheless, the abundance of evidence signals that such stories are the exception and not the rule in the highly regulated generic marketplace.

Slowly but surely, the perception of generic drugs may be coming closer to reality. This issue of *JAMA Internal Medicine* includes a Research Letter by Kesselheim and colleagues[8] finding that from 2009 to 2015, the percentage of physicians who believe that generics may be less effective than brand-name drugs has decreased by half, to roughly 1 in 10. Also in this issue, Patel et al[9] found that a simple modification to an electronic health record, which required an active check to dispense as written, increased the rate of generic prescribing to more than 95%.

Yet the studies in this issue also show how the battle between generics and brand-name drugs continues in different forms. Over time, brand-name firms have developed a number of strategies for perpetuating brand-based monopolies after their initial patent-based monopolies expire. The most direct strategy is using marketing contacts to undermine confidence in generic equivalence. Kesselheim and colleagues report that those physicians whose most recent source of information about generic alternatives was a pharmaceutical representative are most likely to have doubts about their safety and effectiveness.[8] Yeh and colleagues[10] find an association between receipt of payments from pharmaceutical companies, particularly educational payments, and the largely unnecessary prescribing of brand-name statin drugs. This finding is particularly notable because several aspects of this study, including the fact that payments could not be tied to particular drugs, would tend to obscure an association.

Johansen and Richardson[11] assess the effect of a different brand-name strategy: releasing new, patent-protected "me-too" drugs as the original drug goes off patent. Many physicians prescribe these medications at great cost to the patient and health care system even when there is little to no difference from generic alternatives. Johansen and Richardson measure the net increase in health care costs of me-too drugs in hundreds of billions of dollars each year.

This new evidence of the continuing conflict between brand-name and generic drugs has several immediate policy implications. First, payers and clinical organizations interested in improving the value of health care should take additional steps to improve physician and patient understanding of generic drugs. This requires more than merely limiting opportunities for inaccurate and misleading communications on generic substitution from pharmaceutical representatives, as some academic centers have already begun to do. Rather, the articles in this issue underscore the importance of affirmatively teaching clinicians and patients about the history and structure of the generic industry, the meaning of bioequivalence standards, and the current availability of generic drugs. Physicians and other prescribers should understand,

Copyright 2016 American Medical Association. All rights reserved.

Downloaded From: http://archinte.jamanetwork.com/ by a Harvard University User on 05/09/2016

for example, that patients are more likely to take a generic medication that they can afford compared with a me-too medication that offers no additional benefit.

Second, the FDA and the generic drug industry should recognize the continued importance of high standards of bioequivalence and good manufacturing practice. The recently passed Generic Drug User Fee Act substantially expands the resources available to the agency. The main purpose of the boost is to allow the agency to make progress on a backlog that exceeds several thousand pending applications and that has frustrated both Congress and industry. These resources should also help to accelerate review of priority drugs for generic approval, such as those linked to the threat of shortages. Over time, the FDA should invest in developing new methodologies in the fields of pharmacoepidemiology and biopharmaceutics to further address concerns of therapeutic equivalence. For its part, the generic industry should commit to keeping up with quality improvements and must see investing in modernizing facilities as an insurance policy against a loss of faith in their products.

Third, the recent visibility of sudden and dramatic price hikes for old medications may pose more of a threat to the generic industry than initially appreciated. From a policy perspective, the low price of generics is the industry's raison d'être; this enormous value basis helped move the industry from the fringes of the medical world to the center of care. Threatening this position are examples of companies colluding with brand manufacturers as part of "pay for delay" schemes[12]; opaque pricing that may undermine the value of generics for consumers[13]; and, most recently, the emergence of a business model predicated on extraordinary price increases for generic drugs that have only 1 manufacturer.[14] Such behavior by a handful of companies may play into old stereotypes of companies with substandard products seeking a quick return and has already led some to call for lowering the standards for generic drugs or a broad expansion of pharmaceutical compounding in order to bring competition back more readily. Such moves could damage the credibility of the entire industry.

The studies in this issue show great progress—but also great risks—for the generic drug industry in the United States. The industry must rise to these challenges to maintain its critical role for the health care system, for our economy, and most importantly, for our patients.

**ARTICLE INFORMATION**

**Author Affiliations:** Department of Health Policy and Management, Johns Hopkins Bloomberg School of Public Health, Baltimore, Maryland (Sharfstein); Department of Medicine, Johns Hopkins University School of Medicine, Baltimore, Maryland (Greene); Department of the History of Medicine, Johns Hopkins University School of Medicine, Baltimore, Maryland (Greene).

**Corresponding Author:** Joshua M. Sharfstein, MD, Johns Hopkins Bloomberg School of Public Health, 615 N Wolfe St, W1033D, Baltimore, MD 21205 (joshua.sharfstein@jhu.edu).

**Published Online:** May 9, 2016. doi:10.1001/jamainternmed.2016.1720.

**Conflict of Interest Disclosures:** Dr Sharfstein served as Principal Deputy Commissioner of the US Food and Drug Administration from March 2009 to January 2011. No other disclosures are reported.

**REFERENCES**

1. Generic Pharmaceutical Association. Generic Drug Savings in the US—Seventh Annual Edition: 2015. November 2015. http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf. Accessed February 7, 2016.

2. Greene J. *Generic: The Unbranding of American Medicine*. Baltimore, MD: Johns Hopkins University Press; 2014.

3. Gagne JJ, Kesselheim AS, Choudhry NK, et al. Comparative effectiveness of generic versus brand-name antiepileptic medications. *Epilepsy Behav*. 2015;52(pt A):14-18.

4. Kesselheim AS, Misono AS, Lee JL, et al. Clinical equivalence of generic and brand-name drugs used in cardiovascular disease: a systematic review and meta-analysis. *JAMA*. 2008;300(21):2514-2526.

5. Carr T. Are generic drugs like Apotex medication made in India safe: FDA sanctions against some Indian drug plants raise concerns about the US generic-drug supply. *Consum Rep*. April 25, 2014. http://www.consumerreports.org/cro/news/2014/04/are-generic-drugs-made-in-india-safe/index.htm. Accessed February 13, 2016.

6. Eban K. Dirty medicine. *Fortune*. May 15, 2013. http://fortune.com/2013/05/15/dirty-medicine/. Accessed April 3, 2016.

7. Sklamberg H, Schnedar C. From New Jersey to New Delhi, a global focus on quality. FDA Voice. March 24, 2015. http://blogs.fda.gov/fdavoice/index.php/2015/03/from-new-jersey-to-new-delhi-a-global-focus-on-quality/. Accessed February 13, 2016.

8. Kesselheim AS, Gagne JJ, Eddings W, et al. Prevalence and predictors of generic drug skepticism among physicians: results of a national survey [published online May 9, 2016]. *JAMA Intern Med*. doi:10.1001/jamainternmed.2016.1688.

9. Patel MS, Day SC, Halpern SD, et al. Generic medication prescription rates after health system–wide redesign of default options within the electronic health record [published online May 9, 2016]. *JAMA Intern Med*. doi:10.1001/jamainternmed.2016.1691.

10. Yeh JS, Franklin JM, Avorn J, Landon J, Kesselheim AS. Association of industry payments to physicians with the prescribing of brand-name statins in Massachusetts [published online May 9, 2016]. *JAMA Intern Med*. doi:10.1001/jamainternmed.2016.1709.

11. Johansen ME, Richardson C. Estimation of potential savings through therapeutic substitution [published online May 9, 2016]. *JAMA Intern Med*. doi:10.1001/jamainternmed.2016.1704.

12. Community Catalyst, US PIRG. Top twenty pay-for-delay drugs: how drug industry payoffs delay generics, inflate prices, and hurt consumers. July 2013. http://www.communitycatalyst.org/doc-store/publications/top-20-pay-for-delay-drugs.pdf. Accessed February 13, 2016.

13. Thomas K. New online tools offer path to lower drug prices. *New York Times*. February 9, 2016. http://www.nytimes.com/2016/02/10/business/taming-drug-prices-by-pulling-back-the-curtain-online.html?_r=0. Accessed April 3, 2016.

14. Greene JA, Anderson G, Sharfstein JM. Role of the FDA in affordability of off-patent pharmaceuticals. *JAMA*. 2016;315(5):461-462.

Copyright 2016 American Medical Association. All rights reserved.

Downloaded From: http://archinte.jamanetwork.com/ by a Harvard University User on 05/09/2016

key to assessing the value of the care we deliver. It's high time we made measuring PROMs a systematic part of how we deliver health care in the United States.

David Enze Wang, BA
Yusuke Tsugawa, MD, MPH, PhD
Ashish K. Jha, MD, MPH

**Author Affiliations:** Harvard Medical School, Boston, Massachusetts (Wang); Harvard School of Public Health, Cambridge, Massachusetts (Tsugawa, Jha).

**Corresponding Author:** Ashish K. Jha, MD, MPH, Department of Health Policy and Management, Harvard School of Public Health, 42 Church St, Cambridge, MA 02138 (ajha@hsph.harvard.edu).

1. Wang DE, Tsugawa Y, Figueroa JF, Jha AK. Association between the Centers for Medicare and Medicaid Services hospital star rating and patient outcomes. *JAMA Intern Med*. 2016;176(6):848-850.

2. Centers for Medicare and Medicaid Services. HCAHPS: Patients' Perspectives of Care Survey. 2014. https://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-instruments/HospitalQualityInits/HospitalHCAHPS.html. Accessed July 24, 2016.

3. Greaves F, Jha AK. Quality and the curate's egg. *BMJ Qual Saf*. 2014;23(7):525-527. http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&list_uids=24925576&dopt=Abstract

## Payments to Physicians, Prescribing Rates, and More Appropriate Conclusions

**To the Editor** In a study in a recent issue of *JAMA Internal Medicine*, Yeh et al[1] draw a broad conclusion that there is a positive linear relationship between pharmaceutical industry payments to physicians and higher rates of prescribing brand name statins. The authors, however, acknowledge that there is no such relationship over the range of $0 to $2000 per physician during the study period. The article does not include the number of physicians in this group, but because the median payment for the entire sample of physicians was $268, this range clearly represents the vast majority of the 899 physicians. Thus, the conclusion by Yeh et al only applies to a small minority of the physicians in the study and is incorrect for the majority of the physicians.

Inspection of Figure 1 in the report by Yeh et al[1] reveals 26 identifiable physicians who received payments ranging from approximately $20 000 to $470 000. This 3% of physicians accounts for the positive linear relationship. The authors do not state an estimate of variation, but from inspection of Figure 1, this relationship is weak. Further inspection of Figure 1 suggests a steep negative relationship between the variables in the payment range from $0 to approximately $20 000. Even if the stated linear relationship were true in the range of $2000 to $20 000, it would still only account for an increase in brand-name statin prescribing of 1.8% over this range.

More appropriate conclusions from these data include that there is no relationship between pharmaceutical industry payments to physicians and brand-name prescribing for payments up to $2000 per physician per year; and for payments above approximately $20 000 per physician per year, there is a weak positive relationship.

Timothy C. Fagan, MD, FACP

**Author Affiliation:** Department of Internal Medicine, University of Arizona, Tucson.

**Corresponding Author:** Timothy C. Fagan, MD, FACP, Department of Internal Medicine, University of Arizona, 9510 Calle Buena Vista, Tucson, AZ 85704 (tcfaganmd@gmail.com).

**Conflict of Interest Disclosures:** Dr Fagan has served as a consultant to Merck, Syntex and TAP Pharmaceuticals but not for the past 10 years and has been on numerous speaker's bureaus but not for the past 6 years.

1. Yeh JS, Franklin JM, Avorn J, Landon J, Kesselheim AS. Association of Industry Payments to Physicians With the Prescribing of Brand-name Statins in Massachusetts. *JAMA Intern Med*. 2016;176(6):763-768.

**To the Editor** The evidence in the study in a recent issue of *JAMA Internal Medicine* by Yeh et al[1] does not establish the conclusion about the association between industry payments to physicians and the prescribing of brand-name statins. Atorvastatin (Lipitor; Pfizer) was the main brand name drug in the 2011 database used for the study. Pfizer's patent on atorvastatin expired at the end of November 2011.[2] The data appears to have a huge gap with Lipitor at 286 630 claims compared with only 242 generic atorvastatin claims.[1] This creates the impression that most clinicians would choose the brand name drug over the generic equivalent. However, generic atorvastatin was available for just 1 month. Following patent expiration, Lipitor was actually cheaper during 2011 than its generic equivalent.[2]

Physicians might choose atorvastatin over other statins, as studies have shown it may be superior in the settings of myocardial infarction and cerebrovascular events and for overall lipid reduction.[3-5] Since Yeh et al[1] used a claims database, they had no information on why clinicians chose a particular statin and not another. The frequent use of atorvastatin in 2011 could be based on the studies indicating increased efficacy over other available statins.

It may not have been possible for Yeh et al[1] to answer the key question they set out to answer as generic atorvastatin was not available for most of 2011, and, thus, the claim "but equally effective generics" was not appropriate.[1] Although I agree that industry payments can bias physician prescribing, the data do not support their conclusion. It would be helpful to reassess the 2011 data without atorvastatin.

Joseph D. Feuerstein, MD

**Author Affiliation:** Division of Gastroenterology, Beth Israel Deaconess Medical Center, Harvard Medical School, Boston, Massachusetts.

**Corresponding Author:** Joseph D. Feuerstein, MD, Division of Gastroenterology, Beth Israel Deaconess Medical Center, Harvard Medical School, 110 Francis St, 8E Gastroenterology, Boston, MA 02215 (jfeuerst@bidmc.harvard.edu).

**Conflict of Interest Disclosures:** None reported.

1. Yeh JS, Franklin JM, Avorn J, Landon J, Kesselheim AS. Association of Industry Payments to Physicians With the Prescribing of Brand-name Statins in Massachusetts. *JAMA Intern Med*. 2016;176(6):763-768.

2. Josh S. Lipitor Already Cheaper after Patent Expiration. 2011; http://business.time.com/2011/12/01/lipitor-patent-expiration-wont-mean-cheaper-generics-yet/. Accessed June 30, 2016.

3. Amarenco P, Bogousslavsky J, Callahan A III, et al; Stroke Prevention by Aggressive Reduction in Cholesterol Levels (SPARCL) Investigators. High-dose atorvastatin after stroke or transient ischemic attack. *N Engl J Med*. 2006;355(6):549-559.

4. LaRosa JC, Grundy SM, Waters DD, et al; Treating to New Targets (TNT) Investigators. Intensive lipid lowering with atorvastatin in patients with stable coronary disease. *N Engl J Med*. 2005;352(14):1425-1435.

Copyright 2016 American Medical Association. All rights reserved.

Downloaded From: http://archinte.jamanetwork.com/ by a Harvard University User on 10/04/2016

**5**. Murphy SA, Cannon CP, Wiviott SD, McCabe CH, Braunwald E. Reduction in recurrent cardiovascular events with intensive lipid-lowering statin therapy compared with moderate lipid-lowering statin therapy after acute coronary syndromes from the PROVE IT-TIMI 22 (Pravastatin or Atorvastatin Evaluation and Infection Therapy-Thrombolysis In Myocardial Infarction 22) trial. *J Am Coll Cardiol*. 2009;54(25):2358-2362.

**In Reply** From examining our Figure 1,[1] Dr Fagan incorrectly infers a steep negative relationship between payment amounts in the $0 to $20 000 payment range and branded statin prescribing. In fact, the relationship is flat, with 0.03% additional brand-name prescribing for every $1000 received (95% CI, −0.31 to 0.37; $P$ = .86). Dr Fagan arrives at the same conclusion we originally expressed: that the positive association between publicly reported financial ties to the pharmaceutical industry and higher brand-name statin prescribing was driven by physicians receiving the largest payments. Despite Dr Fagan's minimization of this finding, we believe it is important, since prescribing a brand-name statin instead of an equally effective generic can lead to worse cardiovascular outcomes.[2]

We agree with Dr Feuerstein that high-potency statins can offer benefits to certain patients, such as those with known atherosclerotic cardiovascular disease, but it seems unlikely that these patients would be far more prevalent among the prescribers who received more than $20 000 in 2011. We do not agree that minimal prescribing of generic atorvastatin (Lipitor; Pfizer) in December 2011 suggests that physicians preferred the brand-name version. In fact, prices for patients did not change because only 1 generic was sold during that period[3] and because Pfizer sought to limit generic prescribing by negotiating deals with insurance companies about formulary tier placement of Lipitor.[4]

Our findings match other recent studies[5,6] showing pharmaceutical manufacturers' payments are associated with physicians' prescribing practices. Now, the profession should consider whether and how these relationships should be better managed to minimize negative patient outcomes, such as by determining the appropriate limits of physicians' personal financial relationships with industry.

**James Song-Jeng Yeh, MD, MPH**
**Jessica M. Franklin, PhD**
**Aaron S. Kesselheim, MD, JD, MPH**

**Author Affiliations:** Program On Regulation, Therapeutics, And Law (PORTAL), Division of Pharmacoepidemiology and Pharmacoeconomics, Department of Medicine, Brigham and Women's Hospital and Harvard Medical School, Boston, Massachusetts.

**Corresponding Author:** James Song-Jeng Yeh, MD, MPH, Program On Regulation, Therapeutics, And Law (PORTAL), Division of Pharmacoepidemiology and Pharmacoeconomics, Department of Medicine, Brigham and Women's Hospital and Harvard Medical School, 1620 Tremont St, Ste 3030, Boston, MA 02120 (jsyeh@partners.org).

**Conflict of Interest Disclosures:** None reported.

**1**. Yeh JS, Franklin JM, Avorn J, Landon J, Kesselheim AS. Association of Industry Payments to Physicians With the Prescribing of Brand-name Statins in Massachusetts. *JAMA Intern Med*. 2016;176(6):763-768.

**2**. Gagne JJ, Choudhry NK, Kesselheim AS, et al. Comparative effectiveness of generic and brand-name statins on patient outcomes: a cohort study. *Ann Intern Med*. 2014;161(6):400-407.

**3**. Luo J, Seeger JD, Donneyong M, Gagne JJ, Avorn J, Kesselheim AS. Effect of generic competition on atorvastatin prescribing and patients' out-of-pocket spending [published online June 27, 2016]. *JAMA Intern Med*. doi:10.1001/jamainternmed.2016.3384.

**4**. Kaiser C. Senators probe efforts to beat back generic Lipitor. MedPage Today. Published December 1, 2011. http://www.medpagetoday.com/cardiology/dyslipidemia/29972. Accessed August 12, 2016.

**5**. Ornstein C, Jones RG, Tigas M. Now there's proof: docs who get company cash tend to prescribe more brand-name meds. https://www.propublica.org/article/doctors-who-take-company-cash-tend-to-prescribe-more-brand-name-drugs. Accessed August 12, 2016.

**6**. DeJong C, Aguilar T, Tseng CW, Lin GA, Boscardin WJ, Dudley RA. Pharmaceutical Industry-Sponsored Meals and Physician Prescribing Patterns for Medicare Beneficiaries. *JAMA Intern Med*. 2016;176(8):1114-1110.

## American Society of Anesthesiologist Classification—Higher Incentives for Higher Scores

**To the Editor** I read with interest the research letter by Nie et al in a recent issue of *JAMA Internal Medicine* on upcoding of American Society of Anesthesiologists (ASA) classification during endoscopy.[1] This has long been a closed-door talk not described before. Liu et al reported that between 2003 and 2009, the proportion of endoscopic procedures using anesthesia services more than doubled.[2] They estimated that more than two-thirds of the patients were low risk. The gastroenterology professional societies do not recommend routine assistance of anesthesiologist during endoscopic procedures for low-risk patients. A few third-party payors responded by limiting reimbursements to only high-risk patients, with one of the criteria of high-risk patients being an ASA score of III or higher. Nie et al show that following this guideline more patients were assigned a higher ASA score and speculate that this is driven by financial incentives.[1]

This issue should not be a surprise. This was predicted years back and we have watched it unfold. The ASA classification was developed in 1941 for collection and tabulation of statistical data in anesthesia.[3] It was not intended to measure specific anesthetic or surgical risk but got adapted as a preoperative risk assessment tool without any tests of reliability or validity. Multiple studies have shown that ASA scores have poor inter-rater reliability. In fact, in surveys where anesthesiologists assigned ASA scores to clinical scenarios, the scores could range from ASA 1 to ASA 5. These studies cautioned against using ASA classification to design policies or reimbursements.[4] This has largely been ignored as vested interests usurped evidence.

While the ASA classification is an imperfect system, there is currently no better system. Introducing more complex systems to assess patients is not the answer because it would add to the overburden of documentation that already plagues our system. The ASA classification can be made more objective by introducing examples of common scenarios. The original ASA classification included 5 to 10 example patient scenarios for each class in an attempt to encourage uniformity between health care providers. But these examples were removed in a proposed revision to the ASA classification in 1961. The ASA classification by nature will always be a subjective classification dependent on physician's judgment. A potential solution to resolve conflicts of interest is bundled pricing—a fixed payment for endoscopic procedures that includes payment for sedation.[5] Physicians would then have an incentive to use

Copyright 2016 American Medical Association. All rights reserved.

Downloaded From: http://archinte.jamanetwork.com/ by a Harvard University User on 10/04/2016