UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | Court No.: 16-cr-10343-06-ADB |
| v. | ) ) |  |
| JOSEPH A. ROWAN, | ) ) |  |
| Defendant. | ) ) |  |

## GOVERNMENT SENTENCING MEMORANDUM

The United States of America hereby submits this memorandum in aid of sentencing for defendant Joseph A. Rowan.

I. Introduction

Evidence at trial proved that Joe Rowan carried out the criminal strategies at the heart of this case with ubiquitous influence, leading efforts to bribe doctors and emboldening sales reps to profit from those bribes through the Insys Reimbursement Center. His success at bribing physicians led to his promotion and service as a national leader in the criminal scheme. In 2014, as scrutiny from law enforcement increased, Rowan destroyed evidence of his crime. Even after his conviction, Rowan has continued to attempt to subvert criminal accountability, by structuring his assets in a manner designed to avoid forfeiture of the profits generated by this crime. The arrogance with which he carried out, and tried to conceal, the scheme was, and remains, unique amongst the corps of co-defendants who unabashedly committed this crime.

Accordingly, the United States recommends this Court sentence Joseph A. Rowan to a period of incarceration of not less than 10 years (120 months).

II. Rowan's Criminal Conduct

   A. Rowan and Xiulu Ruan

Before the indictment in this case, Joe Rowan and Alec Burlakoff were close friends. 03/01 Tr. 156:11-15. They had roomed together in college, and both had previously worked together at a pharmaceutical company called Cephalon. 03/01 Tr. 115: 11-12, 156:20-22. Just after becoming the Southeast Sales Manager, Burlakoff asked Mike Babich to hire Rowan due to his strong relationship with a doctor in Alabama named Xiulu Ruan. 03/01 Tr. 159:22-160:6. While working at Cephalon, Rowan had bribed Ruan to write prescriptions for that company's fentanyl products. 03/01 Tr. 162:4-20. Accordingly, Burlakoff knew that Rowan would be comfortable with bribing doctors, something he called "the dirty little secret in the pharmaceutical industry that everybody is aware of." 03/01 Tr. 162:7-10. Leaving nothing to chance, at or about the time that Rowan came to work at Insys, Burlakoff explicitly told him that he was expected to bribe Dr. Ruan to write prescriptions for Subsys. 03/01 Tr. 161:19-162:20.

Rowan accepted the job, and set to work bribing Ruan by paying him speaker honoraria in exchange for Subsys prescriptions. 03/01 Tr. 164:1-16. By the end of 2012, Rowan's efforts at bribing Ruan were deemed a tremendous success, and lauded as a model within the company. Ex. 127.

Rowan's efforts at bribing Ruan were so successful that Kapoor and other conspirators became desperate to keep the Alabama physician as a co-conspirator. In February 2014, Rowan and his conspirators had learned that Ruan was writing so many Subsys prescriptions, a wholesaler had begun cutting off supplies of the drug to a pharmacy partially owned by the doctor. 02/13 Tr. Tr. 02/22 Tr. 57: 24-59: 7 & Ex. 39 and Ex. 133. Rather than end the

company's relationship with the doctor, members of the conspiracy negotiated a direct shipment contract with Ruan, avoiding the wholesaler, and increasing the profit he made by the doctor each time he dispensed Subsys from his pharmacy.  02/22 Tr. 59:11-60:3 & Ex. 150.

### B. Rowan's Leadership Role

Months after being hired as a sales rep and assigned to a single doctor, Rowan replaced Burlakoff as the District Manager for the Southeast, responsible for supervising sales reps working with several of the co-conspirator prescribers in this case.  03/01 Tr. 155: 14-130, 192:23-25.  Sales reps in his district were expected to follow the formula Rowan had used with Dr. Ruan, offering bribes to generate prescriptions.  03/01 Tr.  163: 1- 164:7 & Ex. 127.  One year after being promoted to District Manager, Rowan was promoted once again, this time to Regional Sales Director, responsible for supervising one third of the Insys sales force.  Ex. 299.

### C. Rowan and other Bribes

In addition to Xiulu Ruan, the prescribers that Rowan participated in bribing included Dr. Ahmad in Arkansas and Doctor Stephen Chun in Florida.

#### 1. Rowan's Role: Mahmood Ahmad

In late 2013 Joe Rowan and Alec Burlakoff called an old co-worker named Oliver Gauthier, and asked him to join Insys as a sales manager.  03/13 Tr. 212: 17-20.  Gauthier ultimately accepted, taking a position as a district sales manager based in Atlanta.  03/13 Tr. 215:1-2.  At some point, Gauthier was asked to take responsibility for recruiting a high decile doctor in Little Rock, Arkansas named Mahmood Ahmad.  03/13 Tr. 215: 16-216: 7.  Gauthier agreed, and immediately reached out to a former sales rep whom he knew had a long standing relationship with Ahmad.  03/13 Tr. 216: 1-7.

At the time, Ahmad had already been offered bribes by Rich Simon. Ex. 004 (INS5288809); Ex. 009. Despite Simon's efforts, Ahmad was "only" writing one script for Subsys each week. 03/13 Tr. 224:14-17 & Ex. 006. Once Gauthier hired his friend, prescriptions from Ahmad came "pouring in." Ex. 011, Ex. 0036. Ahmad quickly became an important co-conspirator, at one point writing 57 prescriptions for Subsys in less than a month. 03/13 Tr. 241:8-21 & Ex. 2224.

As a regional manager, Joe Rowan micromanaged several aspects of the bribery scheme, including the number speaker programs allotted. Ex. 2338. Throughout their interactions with Ahmad, Gauthier and the sales rep assigned to Arkansas sought approval for speaker bribes directly from Joe Rowan. Ex. 2232. Rowan, who was responsible for managing Ahmad's territory knew that the more speaker programs Ahmad was given, the more prescriptions for Subsys he would write. 03/13 Tr. 250: 6-14. Nevertheless, Rowan monitored and approved the allotment of speaker programs to Ahmad as a matter of routine. 03/14 Tr. 12:20-13:13.

2. Rowan's Role: Steven Chun

When Rowan took over the southeast sales district, his territory included a high decile prescriber named Steven Chun. 03/26 Tr. 56:22-57:4. Chun was referred to as the "six million dollar man," capable of writing prescriptions worth millions of dollars to the company each year. 03/06 Tr. 62:7-24 & Ex. 2126. For the first portion of the conspiracy, Chun proved an elusive target. In August 2012, Chun agreed to accept bribes in exchange for prescriptions. 03/26 Tr. 52:6-53:1. By the time that Rowan took over as manager in the southeast, however, Chun was not meeting expectations. 03/26 Tr. 56:22-57:4.

As a result, Rowan and Burlakoff hired a sales rep whom they knew had a close relationship with Chun. 03/26 Tr. 56:22-57:4. Rowan and others believed that the sales rep, a man named Dan Tondre, was capable of getting Chun to write prescriptions. 03/26 Tr. 58:3:-61:21. After Tondre was hired, Chun agreed to begin writing more prescriptions. 03/26 Tr. 63:2-24 & 2115. Once again, however, Chun did not meet expectations. Id.

In response, Rowan and Tondre advocated for hiring Chun's girlfriend to work in Chun's office. 03/26 Tr. 68: 44:25- 47:13 & Ex. 256. Soon after, Chun's girlfriend was employed by Insys and began handling prior authorizations for Chun. 03/26 Tr. 68: 44:25- & Ex. 256. Once again, Chun did not meet expectations. Ex. 259. An email, sent by Burlakoff to Tondre and Rowan, reveals the degree of Rowan's involvement in the conspiracy:

> Where is Dr. Chun?
> Not Even close to meeting anyone's expectations thus far, perhaps we had failed in setting expectations?
> We were looking to go from 40 percent market share to 90 percent?

Ex. 259. As with with Dr. Ruan, and just like Dr. Ahmad, Joe Rowan joined his co-conspirators in aggressively bribing Steven Chun to write prescriptions in open and complete defiance of the law.

D. Rowan and the IRC

Evidence at trial plainly demonstrated that for everyone involved with the Insys sales force, the success of the IRC was essential. 03/05 Trial Tr. 121:22-122:8. Joe Rowan, like each of his co-conspirators, knew that if bribed doctors wrote prescriptions, but insurance companies refused to pay, no one made money. 03/05 Trial Tr. 121:22-122:8. Rowan conveyed this message unequivocally to his sales reps.

During a breakout session at a National Sales Meeting, Rowan introduced Liz Gurrieri, the manager of the IRC.  Ex. 2280-02, Transcript of Recording, April 19, 2013.  Gurrieri, who was secretly recorded, discussed with the reps how information sent from the prescriber's office was used at the IRC.

First, she discussed how the IRC defrauded insurers regarding tried and failed medications.  Gurrieri told the reps and Rowan,

> I'm seeing more and more opt-ins come in with the tried and failed on there. The more you can include the better. ***We have our own list we go off of if there's nothing on there***, but we really would like that information because that would be helpful."

Ex. 2280-02, Transcript of Recording, April 19, 2013, at 00003:01-05(emphasis added).

Likewise, shortly after discussing tried and failed medications, Gurrieri commented on the IRC scheme to mislead insurers regarding a history of cancer,

> We have to read through everything to see what's in it.  So when we get those [medical records], we actually do go through them and see if there's -- because that's how we find cancer a lot of the time, is because it's in there.  ***It's in those records you sent us but no one told us, so***.

Ex. 2280-02, Transcript of Recording, April 19, 2013, at 00004:010-16 (emphasis added).

The moment was absurd.  Call center operators cannot make up tried and failed medications using preexisting lists; nor can they request help "finding cancer."  But Rowan, the most senior executive in the room, did not object.  To the contrary, after Gurrieri's instructions on how the IRC dealt with tried and failed medications and a patient's history of cancer, Rowan emphasized the importance of filling out opt-ins, by instructing them, "what I am saying is this. This is how you get paid…." Ex. 2280-02, Transcript of Recording, April 19, 2013, at 00011:20-21.

6

E. Obstruction

In the midst of the government's investigation, the United States subpoenaed the cellular phones of several of the defendants. During an interview with civil investigators, Rowan asserted that his phone had accidentally been destroyed during a ski trip. Exhibit #1: Transcript of Interview of Joseph Rowan, April 8th, 2014 at 7-9 (provided in discovery on February 2, 2017). But Rowan's assertions regarding his phone were different when talking with colleagues.

At a national sales meeting in 2014, Joe Rowan and others discussed "being careful" about texting or emailing information discussing doctors. 03/27 Tr. 173:23-174:4. During the conversation, Rowan did not claim an accident with regard to his phone; rather, he bragged that he had thrown his phone over the side of a mountain in order to get rid of documentation. 03/27 Tr. 173:23-174:4.

As described above, the government never received the phone. Rowan's claim to have obstructed this investigation, however, does not stand alone. Following his conviction on May 2, 2019 Rowan continued his efforts at obstruction, rushing through a divorce in order to change the appearance of, if not the actual form of, his assets. The following timeline is illustrative:

| Date | Time | Event |
| --- | --- | --- |
| October 16, 2019 | 10:51 AM | Rowan moved to have his conditions of release modified and his cash surety returned. ECF No. 985. |
| October 16, 2019 | 11:24 AM | the government opposed the motion. ECF No. 986. |
| October 16, 2019 | 12:00 PM | following the filing of both Rowan's motion and opposition, the parties appeared before Judge Burroughs for a hearing on the motions for new trial and related proceedings. Judge Burroughs offered to hear Rowan's motion the following day. |

7

| Date | Time | Event |
|---|---|---|
| October 16, 2019 | 3:30 PM | Probation distributed Rowan's initial PSR indicating assets of at least $3,813,135, $1.5 million of which was in the bank, $1.1 million of which was in securities. Rowan reported liabilities of $831,630, giving him a net worth of at last $3.2 million. Rowan also did not report his wife's monthly income – she is an attorney. During the divorce, Rowan certified his wife's income in 2018 was $165,000. |
| October 17, 2019 | 12:41 AM | Rowan emailed Judge Burrough's clerk and requested the October 17, 2019 hearing on his request be postponed. |
| October 21, 2019 | | Rowan completed a Marital Settlement Agreement and Family Law Financial Affidavit. |
| October 22, 2019 | | Rowan filed for an uncontested divorce in Florida. |
| October 29, 2019 | | Rowan's divorce became final. Among other things, the divorce sought to transfer ownership of the Rowan home solely to his wife. Although the Family Law Financial Affidavit indicates 2 Merrill Lynch accounts are owned solely by the now-former Mrs. Rowan, the Settlement Agreement says Rowan will retain his Merrill Lynch account. |
| October 30, 2019 | | Rowan, seemingly having changed his financial picture, emailed the government to schedule a hearing on his motion to release his bail money |
| November 5, 2019 | | Rowan emailed objections to the PSR to Probation and objected to the Net Worth Analysis "because the information is no longer accurate after the dissolution of his marriage." Rowan asserts that he now has a negative net worth of ($739,950). Rowan indicates a 401K and estimates a balance post-tax penalty. It is unclear whether this is the same Merrill Lynch account mentioned in the divorce agreement. |

Whether rushing a divorce, or failing to disclose the six figure income of his wife to probation, Joe Rowan, once again, obstructed justice in this case.

Relative to other defendants who will appear before this Court for sentencing, Rowan's efforts at obstruction bespeak a striking lack of remorse and disdain for the law. His efforts at obstruction make clear that he is fundamentally dishonest and at high risk of re-offending. In addition, the need for general deterrence is high because this Court must ensure that other

8

executives understand that interfering with civil or criminal investigations has real consequences. And all of this underscores not merely why he deserves to go to prison, but why he deserves a comparatively longer sentence than his colleague, and fellow regional manager, Sunrise Lee.[1]

III.  Conclusion

Joe Rowan was hired exactly because he had extensive experience in pharmaceutical sales and was willing to bribe doctors.  Thereafter, the doctors that he bribed were ultimately responsible for generating prescriptions that became fundamental to the scheme to defraud insurers.  His sentence should be framed in large part to punish him for what he did during the course of the conspiracy, but it should also seek to punish his repeated efforts to obstruct justice. For all of these reasons, the government respectfully requests that the defendant be sentenced to a term of incarceration of ten years.

        Respectfully submitted,

        ANDREW E. LELLING
        United States Attorney

Dated: December 18, 2019    by:   /s/ *K. Nathaniel Yeager*
        K. Nathaniel Yeager (BBO #630992)
        DAVID G. LAZARUS (BBO #624907)
        FRED WYSHAK, JR. (BBO #535940)

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: December 18, 2019        /s/ *K. Nathaniel Yeager*
        Assistant U.S. Attorney

---

[1] Unlike Lee, Rowan also joined the conspiracy in this case with extensive experience in pharmaceutical sales.

10