# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No.:  16-CR-10343-ADB |
| MICHAEL J. GURRY et al., | |
| Defendants. | |

## DEFENDANT JOSEPH A. ROWAN'S SENTENCING MEMORANDUM

Before the Court decides on the appropriate sentence for defendant Joseph A. Rowan, it must reconcile two contradictory sets of facts. On one hand, Rowan is convicted of participating in a significant insurance fraud. He accepts the seriousness of his conviction, and how some of his actions and inactions at Insys are inconsistent with the values he has shared with his family and community.  He joined pharma sales with the thought it would be a way to help people. He deeply regrets the hurt that many people have or will suffer because of the IRC and the speaker program.

On the other hand, outside of his employment at Insys, Rowan has led an exceptionally admirable life. He overcame significant adversity that has shaped him in a positive way: His father was murdered trying to stop a violent assault when Rowan was 11. His single mother raised him and his brother under extremely modest circumstances. Before Insys, Rowan had a fine career as a salesman, and more importantly, he has always had an ethical and positive influence on all those he touched. He has lived a life of kindness and selflessness as the trusted friend, mentor, and father-figure in his community and tight-knit family. One of his friends wrote:

As [his] kids grew older, Joe began coaching their sporting teams; but he wasn't just a coach for his children, he was a mentor to every child. Joe has never allowed his children to live a privileged life, rather, he has taught his children acceptance, tolerance, and honesty. I remember a time when Joe told my husband and myself that his boys were going to be playing in a different football league than their usual neighborhood league. When I asked him why, he told me that there wasn't a coach for the kids over in the public housing neighborhood and that he wanted to be their coach. He said he knew what it was like to be raised without a father and he wanted the kids to know that someone cares about them. He didn't stop there; he took it a step further. He paid the registration fees, purchased shoes, and uniforms for the entire team. Joe didn't only coach that league for one year, he coached them for the next 3 years. He made sure that every member of the team understood that he would never quit on them. There were countless weekends when I would be at their house with Dede [Rowan's wife] and he would invite the kids from his football, baseball, or basketball teams over to the house. Most of those children didn't have parents. Many of them were in foster care while others lived with extended family. I can remember numerous times when kids would stay over and Joe would take them shopping and buy them clothes and new shoes. The happiness he brought those children lit up their world. There was no greater hero to those children than Joe Rowan.

Ex. 1, at 1-2.

Rowan was convicted for an insurance scheme that he neither devised nor controlled.  He is not the type of person who initiates corruption or looks to break the law.  Had he stayed with one of his prior pharma jobs, in a company with an effective compliance program and leadership different from Messrs. Burlakoff and Babich, he never would have ended up a felon.  Instead, Rowan has lost his livelihood and his name is forever infamously associated with the opioid crisis. Other misfortunes have since tested Rowan: a category five hurricane obliterated his house and left him and his family homeless; his marriage ended. Yet, Rowan has complied scrupulously with nearly three years of supervision and various conditions of release. Even after his conviction, Rowan remained the rock of his community because, to those who know him, he has always lived what he preached: he asked others to be kind when he was kind; he asked others to be selfless when he was selfless. For example, a neighbor remembers:

On October 10th, 2018, our peaceful neighborhood and community was hit by a category 5 hurricane named Michael, forever changing our lives. The day before the storm hit, Joe and the boys came over to help my husband and I prepare since we had decided to stay and he urged us to evacuate with them. None of us could predict the extent of the havoc and destruction as a result of the storm. Since there was no communication and roads were not navigable after the storm from the fallen trees and downed power lines, Joe and his family, using a chain saw hiked their way to our homes. After unexpectedly finding us safe, he turned his attention to his house which had been destroyed by the storm. That scene will be with me forever- Joe, his wife and family seeing their front door laying on the porch and furniture strewn in the driveway halfway to the street due to hurricane force winds blowing through their house.

*Id.* at 12.

Over 75 community and family members, neighbors, friends, and colleagues have written to the Court to describe Rowan's role in their lives and to seek leniency on his behalf.  *See* Ex. 1 (collection of letters sent in support of Rowan).

The government's aggressive position on Rowan's guideline range is contrived, legally wrong, and factually unfounded.  It would yield a range completely out of proportion to the conduct of which Rowan has been convicted, and inappropriate to someone who has led such an otherwise admirable life.  It is wholly disproportionate to other sentences imposed on similarly situated Insys former employees.  The Court should calculate the guidelines as set forth below and in Rowan's objections to the draft PSR, and impose a sentence consisting of a period of home and/or community confinement to be determined by the Court.

## I.     THE GUIDELINE CALCULATION[1,2]

---

[1] Rowan's additional objections to the PSR are reported therein.

[2] The probation department calculated the guideline applicable to the fraud counts under U.S.S.G. § 2B1.1(a)(2) (6 points for base offense level). Rowan PSR ¶ 134. The government objected to the probation department's calculation arguing that the correct guideline is U.S.S.G.

A.     **Loss Amount**

Probation has indicated that it would defer the loss amount calculation to the Court after

it had initially computed loss based on an early assessment of IRC reimbursements for Subsys

prescriptions written for non-cancer Medicare and private insurance patients by the thirteen

alleged co-conspirator practitioners. Rowan PSR ¶¶ 121, 135. The government has in return

proposed an amount that significantly exceeded the Probation Department's initial calculation

based on restitution amounts, Gov't Obj. PSR 2, equivalent to the total of non-cancer Subsys

prescriptions or reimbursement calls originating from Insys's Insurance Reimbursement Center

("IRC"). *See, e.g.*, U.S. Mot. Restitution 10, ECF No. 1035. The above estimates overstate the

---

§2B1.1(a)(1) (7 points for base offense level). Gov't's Obj. Joseph Rowan PSR ("Gov't Obj.
PSR") 2, Nov. 5, 2019. In later correspondence, the probation department confirmed that
probation will affirmatively recommend application of the U.S.S.G. § 2B1.1(a)(2) guideline in
the final PSR (Rowan has not yet received a copy of the final PSR). The government's suggested
guideline would be contrary to the language of the U.S.S.G. Section 2B1.1(a)(1) applies <u>only</u> if
"the defendant was convicted of an offense referenced to in this guideline." Otherwise, Section
2B1.1(a)(2) applies. The Application Notes to the Guidelines explain that an offense is
"referenced to this guideline" if "(i) this guideline is the applicable Chapter Two guideline
specifically referenced in Appendix A (Statutory Index) for the offense of conviction, as
determined under the provisions of §1B1.2 (Applicable Guidelines)," U.S.S.G. § 2B1.1(a)(1)
app. note 2(A)(i), *or* "(ii)in the case of a conviction for conspiracy, solicitation, or attempt to
which §2X1.1 (Attempt, Solicitation, or Conspiracy) applies, this guideline is the appropriate
guideline for the offense the defendant was convicted of conspiring, soliciting, or attempting to
commit." *Id.* app. note 2(A)(ii). The offense of conviction in this case is racketeering conspiracy.
Under either interpretation of "referenced to this guideline" available under the Application
Notes, U.S.S.G. § 2B1.1(a)(1) does not satisfy the requirements. First, the guideline referenced
in Appendix A for the offense of racketeering is U.S.S.G. § 2E1.1 – hence U.S.S.G. §
2B1.1(a)(1) would not be the appropriate guideline under Application Note 2(a)(i) and Section
1B1.2(a) of the Guidelines. Second, under U.S.S.G. § 1B1.2(a), U.S.S.G. § 2X1.1 applies to
racketeering conspiracy and, via U.S.S.G. § 2X1.1 and Appendix A in the Guidelines, U.S.S.G. §
2E1.1 is the correct guideline for the offense of racketeering conspiracy. Hence U.S.S.G. §
2B1.1(a)(1) would not be the appropriate guideline under Application Note 2(a)(ii) either.
Applying U.S.S.G. § 2B1.1(a)(1) may only make sense here had Rowan been convicted of
conspiracy to commit mail and wire fraud, <u>not</u> racketeering conspiracy (where the predicate acts
happen to be mail and wire fraud). This is not the case here. Thus, the Court should apply the
U.S.S.G. § 2B1.1(a)(2) guideline recommended in the PSR.

loss attributable to Rowan. The Court should base the calculation on what the evidence shows was Rowan's role in the insurance scheme, and what events were reasonably foreseeable to him.

Loss under U.S.S.G. § 2B1.1 is the "greater of actual or intended loss." *United States v. Iwuala*, 789 F.3d 1, 12-13 (1st Cir. 2015). "Actual loss" is the "reasonably foreseeable pecuniary harm" resulting from the offense.  §2B1.1 app. note 3(A)(i). "Intended loss" is "the pecuniary harm that the defendant purposely sought to inflict." §2B1.1 app. note 3(A)(ii). "(P)ecuniary harm" is "readily measurable in money," §2B1.1 app. note 3(A)(iii), and "reasonably pecuniary harm" is pecuniary harm that the defendant "knew" or "should have known, was a potential result of the offense." §2B1.1 app. note 3(A)(iv).  "(I)ntended loss" includes "losses that might naturally and probably flow from" the defendant's conduct. *United States v. Alli*, 444 F.3d 34, 38 (1st Cir. 2006).

As explained below, the loss attributable to Rowan (whether based on actual or intended loss) should not include the value of non-cancer Subsys prescription paid by Medicare or those derived from government-estimated restitution amounts (non-cancer Subsys prescriptions paid by public and private insurers or those handled by IRC).[3]

First, under an actual loss analysis, Rowan should only be held responsible for fraudulent insurance claims that he could foresee. Fraudulent means claims for which the IRC staff lied to insurers about issues material to the insurers' decisions. There is no evidence that Rowan saw the scale of the IRC fraud. First, there was no evidence showing that Rowan was aware that insurance companies would not approve prescriptions based on calls originating from the IRC;

---

[3] Rowan will address the government's proposed restitution amount, as reflected in its filing of December, 13, 2019 and which is supported by information the government has not disclosed to defendants until December 9, 2019, in separate motion practice.

Rowan had never visited the IRC or attended corporate meetings discussing IRC policy at the Insys headquarters. Call centers such as the IRC are not per se suspect. *See* Jury Charge, Patient Support Programs instruction. Moreover, Rowan had no knowledge of a policy disfavoring reimbursement requests from call centers that some insurance companies had adopted[4].

Second, there was also no evidence supporting a conclusion that, as a sales manager, Rowan knew or should have known that insurance companies would never approve Subsys prescribed off-label (i.e., for non-cancer patients). Insurance companies did in fact approve Subsys and practitioners prescribed other TIRF competitors off-label.[5] The secretly taped training presentation made by Liz Gurrieri to Rowan and his sales team at the 2013 National Sales Meeting confirms this. Trial Ex. 2280-02.   On the tape, Gurrieri does not mention under which conditions insurance companies would <u>not</u> approve Subsys; Gurrieri only tells Rowan and his sales people that they should include "history of cancer" on opt-in forms and tried-and failed medication to increase the chance of approval, and mentions IRC's tried-and-failed medication "list." *Id.* at 2:24-5:13.[6]

---

[4] *See, e.g.*, Testimony of Nicole Schenk, Blue Cross Blue Shield Federal Employee Program, 03/21 Trial Tr. 172:15-173:14 (insurance company policy on call source distributed internally, not a matter of public knowledge).

[5] *See, e.g.*, Testimony of Brian Wehneman, Humana, 3/18 Trial Tr. 181:1-182:3 & 182:11-183:2 &183:9-184:21 (Humana reimbursed Subsys, Abstral and Actiq prescribed off-label); Testimony of Amy-Moyer Carey, CVS Caremark, 3/21 Trial Tr. 53:9-54:2 (CVS Caremark previously approved off-label Fentora for certain prescriptions). That doctors widely prescribed and insurance companies approved Actiq and Fentora off-label was a matter of public knowledge, particularly if one worked in the industry. *See, e.g.*, Testimony of Matt Napoletano, 2/4 Trial Tr. 124:4-125:10 (80% of Actiq and Fentora sold by Cephalon, where Rowan had previously worked, was off-label); Testimony of Michael Babich, 2/21 Trial Tr. 25:19-26:1 ("I was aware that Actiq and Fentora were used off-label. …. I do have visibility that obviously Actiq was approved numerous times.").

[6] Rowan is not conceding anything that would compromise his ability to pursue an appeal. For purposes of this sentencing, he does not dispute or minimize the significance of his

Similarly, under "intended loss," fraudulent reimbursements from IRC misrepresentations unrelated to "history of cancer" or tried-and-failed medication do not qualify as the "natural and probable consequences" of Rowan's conduct as captured on the tape. *See Alli*, 444 F.3d at 38.

Thus, the loss attributable to Rowan should not include every off-label Subsys prescription that insurance companies reimbursed or processed through the IRC. The only evidence that connects Rowan to the IRC relates exclusively to the Gurrieri tape ("history of cancer" and tried-and-failed medication).[7] The government bears the burden of proving loss by a preponderance of the evidence.[8] The government has presented no evidence that would allow for an estimate of the reasonably foreseeable "history of cancer" and tried-and-failed prescriptions reimbursed from Rowan's territory. Approximating this value by the value of all off-label Subsys prescription reimbursements would significantly overstate any Rowan-related loss. There is no evidence on how many or few of the off-label Subsys prescription reimbursements corresponded to patients with a "history of cancer"[9] (but no current diagnosis of cancer) or patients with exaggerated tried-and-failed medication history.

Moreover, even if one could reasonably estimate the loss resulting from "history of cancer" and exaggerated tried-and-failed prescription reimbursements, the Court should not account for any loss derived from reimbursements pertaining to sales territories not run by

---

conviction. But the same evidence that the Court found was sufficient to convict him, also shows that his comprehension of the size and details of the insurance fraud was limited.

[7] The government scrupulously avoided asking IRC witnesses any questions about Rowan.

[8] *See, e.g.*, *United States v. Delima*, 886 F.3d 64, 72 (1st Cir. 2018) ("The government bears the burden of proving the amount of intended loss by a preponderance of the evidence").

[9] It would be fair to assume that not all off-label patients had previously suffered from cancer, thus having a "history of cancer" to be taken advantage of.

Rowan. Insys sales territories operated separately from one another, because of geography and separate management. Rowan did not interact with doctors or the reimbursement process from other territories. Much like other regional managers, Rowan conducted the sales operations of his eastern territory from his home state of Florida, not from a centralized location, such as Insys headquarters in Arizona. Rowan did not visit the IRC headquarters or attend corporate calls discussing IRC policy. Rowan also had no access to information regarding diagnosis or reimbursements for Subsys prescriptions from doctors outside of his territories. Thus, Rowan neither could foresee fraudulent activity resulting from the other territories, nor was anything fraudulent related to those territories the natural and probable result of Rowan's conduct.

Even assuming that certain fraudulent reimbursements for Subsys prescriptions written by doctors in other territories were reasonably foreseeable to Rowan, that would not suffice to make them "relevant conduct" for purposes of Rowan's sentencing.  The relevant conduct "for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy." *United States v. Patriarca*, 912 F. Supp. 596, 605 (D. Mass. 1995) (quoting *United States v. Lanni*, 970 F.2d 1092, 1093 (2d Cir. 1992)).  For sentencing purposes, "[a]cts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct."  U.S.S.G. § 1B1.3 app. note 3(B).  This principle "[r]equires sentencing courts to ascertain on an individual basis the scope of the criminal activity that the particular defendant agreed jointly to undertake." *United States v. Carrozza*, 4 F.3d 70, 76 (1st Cir. 1993) (emphasis added).  *See also United States v. Rigo*, 649 F. App'x 107, 108 (2d Cir. 2016) (collecting authorities).

Accordingly, the evidence does not establish by a preponderance that the loss amounts to the value of reimbursed off-label Subsys prescriptions and the government has not provided any other Rowan-specific estimates.   The loss is too speculative to yield an enhancement under U.S.S.G. § 2B1.1(b)(1).[10] Hence, the Court should not enhance Rowan's offense level.

## B.      Endangering Solvency of Organization

The government seeks to add four levels to the offense level on the basis that Rowan's conduct "substantially endangered the solvency or financial security of" Insys.  *See* USSG § 2B1.1(b)(17)(B)(ii)(I). This adjustment is inapposite given the facts of the case.

Insys went bankrupt following its conviction resulting from multiple forms of litigation, not because of Rowan's conduct.  The enhancement here does not apply to results stemming from the government's legal action, but rather from conduct that directly affected the health of a company. *See, e.g.*, *United States v. Melton*, 870 F.3d 830, 844 (8th Cir. 2017) (finding that a former CFO who had embezzled a large amount from the company had substantially endangered the solvency of the company).  Hence, the Court should not apply this enhancement.

## C.      Risk of Death of Serious Bodily Injury

The government requests an offense level enhancement because the conduct "involved the conscious or reckless risk of death or serious bodily injury," U.S.S.G. § 2B1.1(16)(A).  First, there was no evidence at trial that Rowan was aware that any of the speaking practitioners in question from his territory practiced bad medicine.  Burlakoff testified that Dr. Ruan, one of

---

[10] Gain is not relevant unless "there is a loss" and that loss "reasonably cannot be determined."  *Id.*, app. note 3(B); *United States v. Miller*, 588 F.3d 560, 567 (8th Cir. 2009). The government has not suggested calculation of the loss amount based on gain. Here gain would be equally speculative because it would run into identical problems as those for assessing loss.

Rowan's most significant prescribers, practiced good medicine. 3/1 Trial Tr. 159:23-160:6.

Second, only three witnesses (out of eight who testified about Rowan) stated that Rowan knew

about or approved giving doctors speaker programs to influence prescriptions: 1) Burlakoff

testified about asking Rowan to pay Dr. Ruan with speaker programs, 2) Gauthier offered  highly

impeached testimony that he informed Rowan about Gauthier having offered bribes to Dr.

Ahmad, see infra n. 14, and 3) McKey presented factually impossible testimony that she had

overheard Rowan discuss programs for scripts with Dr. Couch. *See infra* II.D.2.

Were the Court to credit Burlakoff's testimony about Dr. Ruan and Rowan, the Court

should assess this evidence in context. When the company asked doctors to switch to a higher

dosage, Rowan argued for Dr. Ruan's prerogative to make appropriate medical decisions. Trial

Ex. 6828 (email from Rowan to Burlakoff testily asking: "Would you like to have a

teleconference with Dr. Ruan to explain your thoughts on how he should practice medicine?").

Rowan may have cared about company profits, but he was not indifferent or callous about patient

well-being. In fact, the whistleblower tapes show that when he could be most candid to his sales

people, Rowan continued to tell them that Subsys was "best in class," *see, e.g.*, Trial Exs. 7004-

01, 7003-02, 7003-01, that the purpose of the Subsys sales strategy was to switch patients from

other TIRFs to Subsys, Trial Ex. 2281-02 at 26:16-20, and that speaker programs are the way "to

spread the word about Subsys." Trial Ex. 7004-01.  Hence, the Court should not apply this

enhancement.

**D.    Adjustments**

1.    Role in the Offense

The government requested the Court adjust the offense 4 levels upward under U.S.S.G. §

3B1.1(a), for "organizer and leader of a criminal activity." Rowan PSR ¶ 138.  Rowan's role in

the offense does not warrant such an adjustment. Rowan was a regional manager at Insys, yet, the "title" is not controlling under the guidelines. *See* U.S.S.G. § 3B1.1 app. note 1. The Court should instead consider:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.  U.S.S.G. § 3B1.1 app. note 1.

Rowan did not devise, control, or administer any of the Insys policies related to reimbursements or speaker programs. He was a regional manager who worked remotely with sales representatives in his team. He received directions from the Insys headquarters in Arizona (including allotments of speaker programs). The very limited trial evidence connecting Rowan to the IRC shows him acting at the periphery of the insurance scheme. *See supra* I.A. Rowan's sales people may have provided IRC with information (such as a patient's "history of cancer") later used by IRC employees to deceive insurance representatives, but there is no evidence that Rowan lied to insurance companies or that he directed his sales people to. [11]

Rowan is deeply regretful for his involvement in the speaker program.  But it should be noted that during the entire trial, none of the former Insys employees who worked for Rowan ever stated that he told any of them or that they observed him tell others to pay doctors with speaker programs to write prescriptions.[12] His role as a sales manager with the speaker program

---

[11] The government presented no evidence that Rowan did anything suspicious with respect to reimbursement when he was a sales representative covering Dr. Ruan (Burlakoff has testified that Ruan practiced good medicine). None of the witnesses who had previously worked for Rowan testified that they were aware of the IRC fraud or committed or aided any such fraud.

[12] Rowan encouraged his sales people to give small gifts, such as food and wine, to prescribers to gain access. Trial Ex. 2281-02 at 15:11-13 (Rowan noted on tape, "but what I did, I don't think I did anything wrong because I always did it around food."). Such minor (though improper) conduct, however, does not justify a sentencing enhancement under U.S.S.G. §3B1.1.

should not provide a basis to enhance his role in the insurance scheme.  Even the highly suspect Oliver Gauthier testified that he informed Rowan that Gauthier had bribed Dr. Ahmad, not that Rowan encouraged or told him to do that.[13] 3/13 Trial Tr. 238:1-17. Numerous emails presented at trial showed Gauthier reaching out and receiving directions on speaker programs and prescribers directly from Alec Burlakoff, not Rowan—his immediate boss. *See, e.g.*, Trial Exs. 7169, 7173, 7174, 7175, 7177, 7178.

The only other former Rowan subordinate, Jessica Crane, who admitted at trial to illegal acts (bribing Heather Alfonso and Christopher Clough with speaker programs) did not even testify about Rowan. Again, the government purposely avoided asking a witness any questions about Rowan.  Burlakoff testified that Rowan had nothing to do with Heather Alfonso. 3/11 Trial Tr. 190:10-20. It is also undisputed, that one of the whistleblower tapes captured Rowan telling his sales representatives "we don't entice people to speak for us because they will write for us. Okay? That's black and white." Trial Ex. 7201.

In sum, Rowan suggests the Court should use only the IRC-related conduct to decide his role in the offense. That would result in a downward adjustment for minimal or minor participation. U.S.S.G. § 3B1.2. Under these circumstances, the Court should not apply an upward adjustment based solely on uncharged conduct (i.e., involvement in speaker programs).

---

[13] Gauthier offered his incriminating testimony after 1) receiving immunity several days before testifying and 2) never having implicated Rowan in speaker program bribes the four previous times the government had interviewed him, including once in front of the grand jury. *See* 3/14 Trial Tr.  91:22-92:14.

2.     Obstruction of Justice

Rowan objects to the two two-level "obstruction of justice" enhancements proposed by

the government, under U.S.S.G. § 3C1.1. *See* Rowan PSR ¶ 139; *see* Dec 5, 2019 DOJ Letter to

Probation ("Dec. 5 DOJ Letter") 1.

*Lost Cell Phone*

The government bases this enhancement on Beth McKey's testifying at trial that Rowan

admitted to her that he destroyed his phone. *See* Rowan PSR ¶¶ 101, 127. However, other

evidence at trial sheds light on this testimony, showing it not to be credible. *See United States v.*

*Voccola*, 99 F.3d 37, 44 (1st Cir. 1996) (citation omitted) (The government must prove by a

"preponderance of evidence that an upward adjustment was warranted.")

First, McKey actually testified that Rowan admitted to <u>both</u> her and Alec Burlakoff that

he threw his cellphone off a mountain during a ski trip. 3/27 Trial Tr. 173:20-174:6. However, at

trial, Burlakoff directly contradicted McKey's testimony about Rowan's alleged confession,

emphatically stating that he did not believe Rowan purposefully destroyed his phone or ever said

he did so. *See* 3/12 Trial Tr. 71:7-10 ("KENDALL: Fair to say, you never heard Rowan say he

destroyed the phone, did you? BURLAKOFF: I do not believe Joe Rowan destroyed the phone

nor have I ever heard him say he destroyed the phone.").

Second, McKey's testimony is not sufficient to support the obstruction enhancement

because her other testimony was factually impossible, further eroding her credibility. McKey

testified she had told the agents in interviews that she and her husband had overheard Rowan

discussing speaker program quid pro quo with Dr. Patrick Couch at an Insys event in Arizona,

but at trial acknowledged that the FBI agents had told her this could not have occurred.  She then

contacted her now ex-husband who told her he did not witness such a conversation. 3/27 Trial

Tr. 230:10-17. At trial, McKey testified that after checking her text messages and speaking to her ex-husband, she claimed that she had heard Dr. Couch and Rowan have such a conversation at a different Insys event that took place between December 13, 2013 and April 2014, most likely in Arizona. *Id.* at 171:22-173:3; *see also id.* at 221:5-8, 223:11-17, 234:23-235:1, 236:12-19. In response, Rowan introduced publicly available evidence from the Open Payments governmental database that Dr. Couch had never travelled to any Insys event anywhere between December 13, 2013 and March 2014 when McKey resigned from the company. Trial Ex. 7687. The government produced to Rowan voluminous travel records from Insys. *See, e.g.*, Trial Ex. 2241. These records do not show McKey, Rowan, and Dr. Couch together at the relevant time, and the government makes no such claim they were. Given the undisputed trial evidence, McKey's testimony about Rowan's conversation with Dr. Couch was factually impossible. The Court should not credit her statement about Rowan's cell phone either and should reject the government's request for an "obstruction of justice" enhancement based on the lost phone.

Finally, after Rowan's counsel disclosed the telephone loss, Rowan voluntarily submitted to questioning under oath by the U.S. Attorney's Office.  The Government subpoenaed to the grand jury or interviewed several people who were on the ski trip or worked at the mountain.  All of this prodigious effort produced no corroboration to the Government's claim.

*Divorce*

Rowan's wife, Denise Rowan, has been a practicing lawyer for about two decades, with independent sources of income. Her assets and earnings are not relevant to argue fines or forfeiture considerations. In October 2019, Denise filed for divorce. Dec 5 DOJ Letter, Attachment, Ex. 1, Settlement Agreement 1. The government incorrectly argued that Rowan had

filed. Dec. 5 DOJ Letter 2. On October 30, 2019,[14] the divorce became final. DOJ Letter, Attachment, Ex. 1, Final Judgment of Dissolution of Marriage 1. As result of the divorce, no asset other than Rowan's half-interest in the family home would shift from Rowan to Denise. *See* Dec 5 DOJ Letter, Attachment, Ex. 1, Settlement Agreement 3. Denise and their minor children will reside in the home once rebuilt following its 2018 destruction in the hurricane.

The government deemed the above information sufficient basis to claim that Rowan had obstructed justice, impeding restitution. The government circled on the discrepancy between the PSR's estimate of Rowan's net worth and his net worth after the divorce. Dec. 5 DOJ Letter 2. Yet any apparent discrepancy is the result of several mistakes in the PSR, not of nefarious actions by Rowan.

First, the net worth estimate in the PSR overstates the asset value even before the divorce. *See* Rowan PSR ¶ 197. The PSR most likely double counted the value of the family home and that of the individual 401k accounts of the two spouses.[15] In other words, the PSR reported as separate assets <u>both</u> the bank accounts holding the home insurance settlement proceeds following Hurricane Michael and the appraised value of the family home <u>before</u> its almost complete destruction during the storm. The house will regain the value as appraised prior to the storm only after using the insurance settlement to cover the reconstruction and furnishing costs.

Second, the PSR most likely double counted the value of the 401k accounts (once as bank account assets and once as securities assets). Neither Rowan nor his former wife hold any

---

[14] This date is the filing date for the Final Judgment for Dissolution of Marriage. *See id.* The judge had signed the order one day earlier, on October 29, 2019. *Id.*

[15] Rowan paid legal fees for his criminal defense from one of the bank accounts over the summer. Rowan expects to liquidate his 401k accounts to cover part of his unpaid criminal defense legal fees.  Any such funds will be held and segregated prior to sentencing.

securities other than their respective 401ks.[16] Denise's 401k accounts are not relevant for sentencing. In any event, the PSR value assigned to Rowan's securities significantly overstates the value of his 401k. It is unclear how the Probation Department arrived at the PSR amount.

Third, the PSR reported as relevant assets, bank accounts, 401k accounts and real estate assets held solely by Denise Rowan, which are not subject to restitution.

Fourth, awarding the family home to the parent with whom the children will reside is customary in divorces. This parent may only be Denise Rowan, given Rowan's uncertain future. Although the divorce settlement awards Rowan's interest in the home to Denise Rowan, Rowan has not yet deeded this interest to her. Hence, nothing has changed since the divorce. Should the Court include the home in the restitution amount, Rowan has not impeded this.

Lastly, the government bears the burden to prove that any of the asset amounts Rowan reported to the Probation Department are incorrect or that any of the transactions contemplated by the divorce amount to obstruction of justice.[17] The government has provided no evidence of liquidated or missing bank accounts or securities. Instead, in its pursuit of a fearsome guideline calculation, the government exploits a family's misfortune and ignores the damage that the stresses of the past several years have inflicted on Rowan's marital relationship. The Court should not adjust the offense level for obstruction of justice. [18]

---

[16] Rowan may still hold some Insys stock. Given the company's bankruptcy, that asset is most likely worthless.

[17] *See, e.g.*, *United States v. Castellone*, 985 F.2d 21, 26 (1st Cir. 1993).

[18] Adopting the government's objections to the PSR would result in a sentencing guideline range of over 20 years for Rowan. The Court should reject a sentencing guideline range near or above the statutory maximum because "the offense levels determined under the guidelines substantially overstates the seriousness of the offense." U.S.S.G. § 2B1.1 app. Note 21(C). The loss amount, in particular, as the main determinant of the sentencing guideline's severity "will almost always be the subject of departure scrutiny." United States v. Roen, 279 F. Supp. 2d 986, 990 (E.D. Wis. 2003). This scrutiny applies particularly where "the defendant

## II.   THE SENTENCING FACTORS

The sentencing factors of 18 U.S.C. § 3553(a) support a period of home and/or community confinement to be determined by the court.  Such a sentence would accomplish the purposes of sentencing, while any greater term of incarceration would be more than necessary. The following sections focus on Rowan's history and characteristics, on the nature and circumstances of the offense, and on preventing unwarranted sentencing disparities between Rowan and others.

### A.   Rowan's History and Characteristics

Rowan's history and personal characteristics show he has a life-long record of generosity and kindness.  He has always been an optimistic, earnest, trusting, trustworthy, and generous member of his family and his community who "never loses faith in friends, family, life."[19] A pastor calls Rowan "one of the kindest and sincerest persons I have ever had the pleasure of knowing." [20]  Rowan's children look upon him as their rock and role-model.[21] He is a reliable friend and much more than a good neighbor. In every context, Rowan is the proverbial person

---

plays a limited or inferior role in the scheme that bore little relationship to the amount of loss determined under the guideline." Id. at 991. Hence, if the Court agrees with the loss amount, the Court should depart downward so as not to overstate the severity of Rowan's offense.

[19] Ex. 1, at 24. Two friends also write that because of Joe's "zest for life and energy, people are drawn to him. " Id. at 92. Joe is a "a huge motivator and energizer," adds a family friend. Id. at 76. Rowan's sister-in-law calls Rowan "a larger-than-life personality. He is an outgoing and funny person who doesn't hide anything… Good or bad, he projects who he is to everyone." Id. at 8. A friend notes that Rowan's "good nature, his infectious laugh, his kind words, his caring for you and your family is genuine and people feel it." Id. at 26. Another friend who has known Rowan for twenty years notes that "Joe's character is pure to the core. He believes in everyone until they disprove him." Id. at 13.

[20] Ex. 1, at 31.

[21] Ex. 1, at 55.

who would give the shirt off his back.[22] Rowan "has always been a person that takes care of his

friends, family, and anyone that needs help."[23] His prior record is spotless. PSR ¶ 160.

Rowan's brother writes how tragedy struck Rowan during his childhood:

Joey and I grew up in a low income, divorced family, whose father was murdered
while trying to do the right thing and stop an unknown man from taking a gun into
a house full of people where he wanted to hurt the people inside. Joey was just 11
years old and I 15.

Ex. 1, at 9.

Yet, Rowan persevered with optimism and grace to graduate college, establish a career as

a salesman, build a family, and become the father he had missed for a large portion of his

childhood. *See, e.g.*, *id.* at 82 ("…because Joe lost his own father when he was young, he made

every effort as a man and father to be there for his children growing up."). Former colleagues

and customers wrote to the Court to speak of his virtues. *See, e.g.*, *id.* at 21 ("[Rowan] was a

mentor to me when we worked together and in the delicate world of pharmaceutical sales he

made sure I did and said the right things to be morally and ethically above board.").[24]  Friends

have struggled to find words to express to the Court what Rowan meant to them: someone

always ready to help, a shoulder to cry on when in need, a mentor and a calming voice in the

middle of a storm.[25] "Words alone can not [sic] express the feelings and emotions I have when

---

[22] Numerous friends and acquaintances describe Rowan so. *See, e.g.*, *id.* at 27-28.

[23] *Id.* at 22.

[24] The writer of this letter, Kevin Flynn, is a former Insys sales representative who
testified for the government at Dr. Clough's criminal trial to give a compliant view of sales.
Flynn was one of three Rowan's Insys colleagues who contacted him and volunteered to testify
in his defense.

[25] Rowan's nephew states that "Joe is a great mentor, father, and man. It is impossible to
describe him in a short letter…. Joe is the father I would like to be." *Id.* at 40.  A friend notes that
Rowan is "giving, selfless, authentic. " *Id.* at 97. Another long-term friend notes that Rowan "is
simply the best. He is honest, loyal, thoughtful of other and very supportive." *Id.* at 35.  "When

thinking of Joe, what his friendship means to me and the positive impact he has made in my life," writes a long-term friend. *Id.* at 79.

As his career progressed and his family grew bigger, Rowan made his home in different parts of the country. Yet, wherever he was, Rowan touched everyone he encountered with his generosity and kindness. A college friend writes:

> I did not have a vehicle while in school and had to work to make ends meet. My work options were limited to places within a 2 mile radius in the event I had to walk. I walked home at 2am many times as I was too embarrassed and immature to ask for help. However, Joe soon figured it out. He made me realize there was no need to be embarrassed and offered to help. From that point forward Joe would loan me his car or drive me to and from work.

*Id.* at 28.

Rowan has made Panama City his home for the past decade. He grew into a pillar of that community[26] through his work with children, his mentoring role in a religious study group he initiated, his relentless work in helping others during the catastrophic Hurricane Michael, and his numerous acts of kindness. A neighbor remembers:

> A couple of years ago, Joe had noticed a young girl stranded in the middle of the road with her car broken down. Joe stopped, helped this young girl move her car out of the road. This was not the greatest part of town and Joe would not leave her alone there. He took her to her mother's house and this young girl is very grateful to Joe for stopping. Turns out, this girl is my future daughter-in-law.

---

one of our friends is going through difficulties or needs help or advice, Joe is the first person that many of us have always called," states a friend.  *Id.* at 113. Rowan "has always been there," summarizes a friend. *Id.* at 108. Rowan was the first person one of his friends called when his wife was diagnosed with cancer. Rowan "became the strength" of that family, always offering "words to encourage and strengthen" the friend. *Id.* at 88. A friend notes that "[w]henever I find myself in a bind, either as a person or as a father, I always ask "what would Joe do?" and I follow through in the same manner that I know he would demand of me." *Id.* at 36. The same friend mentions that Rowan helped him overcome depression. *Id.*

[26] A neighbor notes that Rowan's "presence, compassion and mentorship throughout our community has been a blessing." *Id.* at 91. "Joe is not only a pillar in his family, but also his community," writes a sister-in-law. *Id.* at 75.

*Id.* at 32. Another friend who manages a yacht club remembers that his chef at the club "had

a 28 year old son who developed brain cancer and was given 2 weeks to live. Joe rented him

a car so he could drive to Georgia and see his son before he died." *Id.* at 94.

As someone who grew up without a father, Rowan understood the importance of

role models for children, not only his own. [27] Rowan opened his home and heart to children

from less fortunate financial or family circumstances. A friend explains:

> During a conversation with Joe, he told me about what it was like to grow up
> without a dad. He said he would overcompensate by acting tougher than he was so
> he could prove he wasn't different. He said that he remembers being embarrassed
> that his shoes were old, and he had to reuse the same equipment. He told me that if
> he could prevent one kid from the same embarrassment, it would make him a happy
> man.

*Id.* at 97.

Another friend adds:

> My husband is a teacher at a Title One School and on many occasions when he has
> mentioned to Joe of kids in need of shoes/ clothes/ backpacks, Joe has
> anonymously donated supplies immediately.

*Id.* at 37. In turn, children looked up to Rowan.[28] *See, e.g.*, *id.* at 18 (Rowan's niece writes,

"[w]henever I was a little girl, I was enamored by how [Rowan] could make me feel like

the most special person in the world. He has a gift in that way.").

---

[27] A friend notes that Rowan volunteered to coach little league baseball and that "Joe has
been instrumental in calming [the kids'] fears and helping them through the process." *Id.* at 22.

[28] A friend explains that her eight-year-old son struggled in little league baseball but "Joe
continually worked with him and encouraged him. Joe seemed to have a connection with the kids
that made them feel accepted and most of all, they trusted him." Ex. 1, at 96. Rowan "loves kids
and the kids love Joe!!!," writes a friend from Panama City. Ex. 1, at 46. The father of one of the
kids Rowan coaches on the baseball team, notes the son prefers the advice coming from "Coach
Joe." *Id.* at 126.

When a single mother of six boys struggled with raising her sons, both financially and emotionally, Rowan offered to "step in" and help deescalate her relationship with one of her sons, Eli. *Id.* at 4. The single mother recalls Rowans' decision two years later when her relationship with her son, then age twelve, strained to a breaking point;

> One Monday in March of 2017, Joe called to check on Eli. I immediately broke down and said, "I need help." Without hesitation or even speaking with Dede [Rowan's wife], Joe said, "pack a bag and bring Eli to me after school." That day would be a day forever etched in my heart and the hardest choice I ever had to make as a mom. I knew Eli would be loved and treated as their own son and needed to have a male father figure in his life. I was not able to provide what he needed at that point in time.

*Id.*

Rowan and his family supported Eli, included him in all their family vacations and activities, and "gave him the love and guidance he needed." *Id.* When the now almost-fifteen year old returned to his mother this past September, after Rowan's conviction, the love and nurture the Rowans provided had turned him into a "fabulous role model for his younger brothers." *Id.* Rowan "continues to play a vital role in Eli's life, calling him and checking up on him." *Id.* at 4-5.

Rowan's relationship with people in his community and even strangers flourished because of his unbridled generosity and love for his fellow human beings: when Rowan observed a family having a flat tire on the highway he stopped and spent hours helping them;[29] he opened

---

[29] Rowan's sister-in-law remembers that when Rowan was in college and had to drive home to Tampa, he was late by three hours. *Id.* at 6. Rowan had seen "a car stopped on the side of the highway with a flat tire. As he passed by he saw it was a family of five, so he turned around to render aid. He ended up loading the defective tire into his car and drove the father to get a replacement. He then took the father back to his family and car and ensure they were able to get back on their way. He got nothing out of this act of kindness other than knowing he helped someone." *Id.*

his home to provide shelter to friends who struggled financially;[30] he drove many hours at night to share in the joy of the birth of his first niece;[31] he spent hours finding a good roofer to repair the roof of a man's home.[32] Rowan's sister-in-law remembers:

> At Christmas, my nephew, Joey's second son, told me about how his father and he were at a store to buy a new bycicle [sic] he wanted. As they were looking over the bike they were going to purchase, there was another young boy admiring the same bike. But Joey noticed the boy's mother was looking crestfallen, so, he bought the bike for her so she could give to her son. This was a complete stranger!

*Id.* at 7.

Rowan has not despaired, nor abandoned his drive to be a positive force following his prosecution and more recent conviction.[33] When Hurricane Michael hit in November 2018, the Rowans lost their house and its contents. They first moved in with relatives and then into a mobile home. Yet, while the devastation of the hurricane had just become obvious, Rowan "rallied together a team of people to deliver food and water to the neighborhood of the boys he

---

[30] *Id.* at 39 ("Following our wedding, my husband and I made the difficult decision to commute between Atlanta and Panama City for work for a year. Being newlyweds, we struggled with how to maintain two households. I'll never forget a phone call from Dede one day, "Joe and I want you to move in with us for as long as you need to." I became the sixth wheel of Team Rowan. Joe became the brother I always wanted, and I had firsthand knowledge of his adoration for his wife and children as I was part of the Rowan home for a year.").

[31] Rowan's brother remembers: "When my daughter was born (the first between us), my brother was living in Atlanta and I in Tampa. I called him about 4am and told him it was time and we were on our way to the hospital. There was no hesitation, there was no 2nd thought, he knew he had to be there. And just within a few hours he had gotten on a plane and was there to hold his niece." *Id.* at 9.

[32] A friend notes that, after Hurricane Michael, a man he and Rowan were meeting with "was describing that his roofer would not come back to finish his home…. Joe spent his afternoon finding a roofer to fix that man's roof. Not only finding someone to say he would do it, but someone who actually completed the roof." *Id.* at 13-14.

[33] A friend notes that Rowan "has been a source of constant unwavering optimism even in the midst of his own personal situations." *Id.* at 95.

had coached over the years. He and his four children delivered truckloads of water and supplies

for the people for the next 4 weeks."[34]   He offered shelter in his family's own temporary

housing accommodations to other families in need.[35] He helped cut fallen trees and free roads in

his community. He "sacrificed himself for the good of others" and "put his community first." *Id.*

at 2. None of this generosity surprised those who know Rowan because they have known him to

live what he preaches.[36]

Rowan's life has been, and continues to be, a succession of contributions to the

flourishing and happiness of the people around him.  This case has already caused and will

continue to cause him and his family negative impacts.  An excessive sentence is not necessary

to fulfill the goals of the sentencing statute, 18 U.S.C. §3553, and it would only be detrimental to

those whose lives Rowan touches.[37]

---

[34] *Id.* at 2. A local pastor remembers that Rowan "single-handedly made certain that I fed members of my church's congregation for WEEKS following the storm." *Id.* at 31.

[35] A friend notes: "I remember meeting [Rowan] off the Interstate 10 when there was no gas to be found in Panama City. I loaded him up with 7 gas cans full. He took them straight to Panama City and gave them to people who needed them. He never once thought about himself or his family. They rented a house about 30 minutes from the city, and offered for friends to come and stay with them." *Id.* at 22.

[36] Rowan's niece "watched [Rowan] pray with homeless people." *Id.* at 20.

[37] Rowan's niece states that "it makes [her] sick to [her] stomach thinking of "home" without Joe." *Id.* at 20. Rowan's former foster son adds that "Joe Rowan, J.D. is a great man looking out for others and not himself, and that if he were to be away from his family and his friends and me, it would be detrimental to us all." *Id.* at 30.  A friend explains that "…it is so important for Joe to continue being part of our village, community, our City….Joe is not ordinary, he is an anointed, incredible, loving, kind, bold human. He knows how to love the very best of who you are and completely changes the world he is in." *Id.* at 25. From Rowan's eldest son explains that "[d]oing life without the man I called Dad will be impossible." *Id.* at 58. "I am not sure what I will do without him," adds his daughter. *Id.* at 57. Rowan's youngest son writes, "my Dad is my everything and if his sentence is long, I would no longer have my best friend and my right hand man with me for awhile." *Id.* at 55.

**B.      The Nature and Circumstances of the Offense**

The mail and wire fraud predicates rest on Rowan's participation in the Insys insurance fraud scheme. However, the limited trial evidence about Rowan and the insurance scheme placed him at its periphery. The government could not find a single witness to testify that Rowan participated in the IRC scheme or a single former sales representative from Rowan's team to testify that they were aware of the IRC scheme. The government's evidence centered on a small excerpt out of a surreptitiously taped longer presentation by Gurrieri[38] to Rowan and his sales team. The excerpt contained no open conversation of IRC tactics.

In essence, Rowan stands convicted of having been generally aware of parts of the IRC scheme ("history of cancer"; tried-and-failed medication) and having asked his sales reps to provide <u>accurate</u> information to the IRC that the IRC could later use to mislead insurers.

The government presented evidence at trial related to payments to prescribers in the shape of speaker programs in exchange for scripts. The Court's Order on post-trial motions found that bribing doctors with speaker programs increased the number of prescriptions, facilitating the IRC insurance scheme. Mem. Order Defs.' Mot. J. Acquittal ("Order") 29, ECF No. 1028.

Yet, as discussed earlier in this memorandum, *see supra* I. C, the evidence connecting Rowan to speaker programs is more nuanced than the government would have it and does not support a conclusion that Rowan sought profit at any cost or risk to the patient.

---

[38] The tape transcript is six-page long, out of 42. *See* Ex. 2 (first and last page of the Gurrieri tape).

The nature of the offense consequently justifies a sentence consisting of home and/or community confinement, which will allow Rowan to continue to contribute to his family and community, and not warehouse him.

## C.    Sentencing Parity

Finally, the proposed sentence is necessary to avoid unwarranted disparities between Rowan and other former Insys employees with similar records. 18 U.S.C. §3553(a) (6) (the Court should consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"); *see United States v. Robles-Alvarez*, 874 F.3d 46, 52 (1st Cir. 2017).

Rowan's minimal involvement with the IRC scheme as well as his overall role is akin to that of several former Insys sales representatives who pled guilty to conspiracy to violate the Anti-Kickback statute, 18 U.S.C. § 371: Karen Hill, Natalie Perhacs, and Natalie Babich. *See* Plea Agreement ("Hill Plea"), *United States v. Hill*, 17-cr-00139 (S.D. Ala), ECF No. 3; Plea Agreement ("Perhacs Plea"), *United States v. Perhacs*, 16-cr-00024 (S.D. Ala), ECF No. 2; Plea Agreement, *United States v. Levine*, 17-cr-00147 (D. Conn), ECF No. 8. Hill, Perhacs, and Babich all reported to Rowan for a part of their employment.  The charges and pleas for these three individuals stemmed from the same set of facts that were at issue in this case: speaker program payments to practitioners to influence the writing of Subsys scripts.

Perhacs was the sales representative covering Drs. Couch and Ruan after Rowan became a manager. Perhacs Plea 4-5. Perhacs's sentence was up to 6 months of home confinement, five years of probation and community service.  J., *United States v. Perhacs*, 16-cr-00024 (S.D. Ala), ECF No. 28. Natalie Babich, Michael Babich's wife, was a sales representative who secretly but aggressively bribed practitioners Alfonso and Clough via sham speaker programs. *See, e.g*., 2/12

Trial Tr. at 29:4-23 (Heather Alfonso testimony). Natalie Babich received a non-custodial sentence of five years of probation.[39] J., *United States v. Levine*, 17-cr-00147 (D. Conn), ECF No. 57. Karen Hill was a District Manager of the Miami area (managing Perhacs and covering doctors such as Ruan, Couch, and Chun) and later received a promotion to Regional Manager, the same title and role as Rowan. *See* Hill Plea 10-11. In essence, Hill had approximately the same responsibilities as Rowan and covered similar practitioners. Hill's sentence was six months of home confinement and five years of probation. J., *United States v. Hill*, 17-cr-00139 (S.D. Ala), ECF No. 25. The Court should sentence Rowan in a range comparable to that of Perhacs, Natalie Babich, and Hill.[40]

### III.   CONCLUSION

For the foregoing reasons, the Court should impose on Rowan a sentence consisting of a period of home and/or community confinement to be determined by the Court. Given his negative net worth and dim prospects for employment, any fine should not exceed $10,000.

JOSEPH A. ROWAN

By his counsel,

---

[39] Michael Babich testified at trial that obtaining a lesser sentence for his wife was not within the scope of his cooperation agreement, hence that her sentence would depend on her conduct alone. 2/22 Trial Tr. 24:3-8.

[40] We note that Rowan's conviction based on participation in the insurance scheme does not suggest that his insurance-related conduct was more severe than that of Perhacs, Natalie Babich, or Hill. The Court affirmed the verdict against Rowan on the mail and wire fraud predicates not because Rowan had done anything worse than other sales representatives or managers, but because the Court considered that he was similar to other sales people. Order 36 ("[T]he jury could have found that the IRC's strategies for fraudulently gaining prior approval were well known among Insys sales representatives who provided opt-in forms to the IRC.").

/s/ Michael Kendall
Michael Kendall (BBO# 544866)
michael.kendall@whitecase.com
Alexandra I. Gliga (BBO # 694959)
alexandra.gliga@whitecase.com
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
Telephone: (617) 979-9300

**CERTIFICATE OF SERVICE**

I hereby certify that, on the date appearing in the header of this page, this document is being filed through ECF system, which will deliver copies to all attorneys of record.

/s/ Michael Kendall